**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **J&R PASSMORE, LLC** *et al.*, | : | |
| | : | |
| **Plaintiffs,** | : | **Case No. 2:18-cv-01587** |
| | : | |
| **v.** | : | **Chief Judge Algenon L. Marbley** |
| | : | |
| **RICE DRILLING D, LLC** *et al.*, | : | **Magistrate Judge Kimberly A. Jolson** |
| | : | |
| **Defendants.** | : | |

**OPINION & ORDER**

This matter is before this Court on Plaintiffs' Motion for Class Certification pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), Motion to Strike John McBeath, and Motions to Strike the Declarations of Lucas Herren by Defendant XTO Energy, Inc. and Matt Reser by Defendant Ascent-Resources Utica, LLC. (ECF Nos. 382; 396; 397; 400; 408). Plaintiffs submitted identical Motions to Strike the Declaration of Matt Reser, except for one redacted section in ECF No. 400 which was corrected in ECF No. 408. (ECF Nos. 400; 408). Because the first Motion to Strike the Declaration of Matt Reser is a duplicate, this Court will treat it as **MOOT**.

For the reasons below, this Court rules as follows: (1) Plaintiffs' Motion for Class Certification (ECF No. 382) is **DENIED**; (2) Plaintiffs' Motion to Strike John McBeath (ECF No. 396) is **DENIED**; (3) Plaintiffs' Motions to Strike the Declarations of Lucas Herren and Matt Reser (ECF Nos. 397; 408) are **DENIED**; (4) Plaintiffs' duplicative Motion to Strike the Declaration of Matt Reser (ECF No. 400) is **DENIED** as **MOOT**.

1

# I. BACKGROUND

## A. Factual Background

Plaintiffs J&R Passmore, LLC ("Passmore"); Bruce and Jennifer Schuster; Brent and Doreen Butler; and Ryan and Cheryl Feiock own various pieces of property in Belmont County, Ohio, as well as the oil and gas rights to these properties. (ECF No. 38, ¶¶ 1–4) (together "Named Plaintiffs"). Defendant Rice Drilling D, LLC, ("Rice") entered into leases with Plaintiffs for the development of oil and gas minerals on Plaintiffs' properties. (*Id.*, ¶¶ 31–37).

Rice and Defendant Gulfport Energy Corporation ("Gulfport Energy") entered into an agreement whereby they agreed to drill wells in Belmont County. (*Id.*, ¶ 46). Pursuant to this agreement, each drilled wells on Passmore's property, while Rice drilled additional wells on the Schusters', Butlers', and Feiocks' properties. (*Id.*, ¶¶ 49–50, 62, 71, 80). Rice and Gulfport Energy shared in the revenue produced from the sale of oil, gas, and other hydrocarbons from the wells on each of these properties. (*Id.*, ¶¶ 54–58, 65–66, 74–75, 82–83). Rice also assigned certain interests it had in its lease with Passmore and in certain leases with other putative class members to Defendant Gulfport Appalachia, LLC ("Gulfport Appalachia") (hereinafter Gulfport Energy and Gulfport Appalachia will be referred to together as "Gulfport"). (ECF No. 262 at 1).

XTO Energy Inc. ("XTO") and Ascent Resources–Utica, LLC ("Ascent") entered into an agreement to facilitate the funding, exploration, and development of their jointly owned interests. (ECF No. 38, ¶ 92). XTO and Ascent also have agreements with Rice to allow XTO and Ascent to drill wells on the Passmore and Schuster properties. (*Id.*, ¶ 93). Pursuant to these agreements, XTO drilled wells on the Passmore and Schuster properties. (*Id.*, ¶¶ 96, 107). XTO and Ascent share in the revenue produced from the sale of oil, gas, and other hydrocarbons produced from the

wells on these properties. (*Id.*, ¶¶ 97, 100–05, 108, 111–14). Additionally, XTO has acquired interests in four leases containing the contract language at issue in this matter. (ECF No. 391 at 3).

Plaintiffs allege that Defendants have infringed on Plaintiffs' mineral rights by drilling outside of the terms of the Rice leases. (*Id.*, ¶¶ 51–52, 63–64, 72–73, 80–81, 98–99, 109–10). Plaintiffs allege that the leases limit Defendants to drilling in the Marcellus Shale and Utica Shale rock formations and reserves to the lessors "the rights to all products contained . . . in all formations below the base of the Utica Shale." (ECF Nos. 38, ¶¶ 33–44; 382 at 2, 13) (hereinafter the "Reservation Clause"). Despite this "clear reservation," however, Plaintiffs argue that "Defendants have unlawfully drilled every well below the base of the Utica Shale into and are producing oil and gas from the Point Pleasant Formation," which is reserved to the putative class. (ECF No. 382 at 2). While the parties and their respective experts agree that the Marcellus Shale, Utica Shale, and Point Pleasant Formation are separate geological formations, the parties disagree on the interpretation of the contract language within the leases held by the putative class. (*Id.* at 19). Specifically, Defendants allege that at the time of the contract negotiations, the Point Pleasant Formation was understood to be part of the Utica Shale, and therefore, the language in the leases still allows them to drill into the Point Pleasant Formation. (ECF No. 387 at 1).

Plaintiffs, on behalf of themselves and other similarly situated owners of oil and gas mineral rights located in Belmont County, Ohio, seek: (1) a declaratory judgment that their leases (the subject "Class Lease") specifically and unambiguously reserve all oil and gas mineral rights and estates below the base of the Utica Shale formation to the lessees; and (2) damages for bad-faith trespass, conversion, and unjust enrichment from the Defendants for knowingly drilling and producing oil and gas from the Point Pleasant Formation. (ECF No. 382 at 9).

3

## B.     Procedural Background

Named Plaintiffs filed this action on December 6, 2018. (ECF No. 1). On February 28, 2019, Plaintiffs filed an amended Complaint. (ECF No. 38). The Defendants then filed a series of Motions to Dismiss. (ECF Nos. 47; 48; 49). On November 15, 2019, this Court took the following action: (1) denied Rice's Motion to Dismiss; (2) granted Ascent and XTO's Motions to Dismiss as to the Butlers and Feiocks; (3) denied Ascent and XTO's Motions to Dismiss as to Passmore and the Schusters; (4) and dismissed the Butlers' and Feiocks' claims against Ascent and XTO. (ECF No. 82 at 15). In July 2021, Plaintiffs filed and were granted an unopposed Motion to add Gulfport Appalachia, LLC as a defendant because Gulfport Appalachia was assigned some of Rice's interests in the leases and in light of Gulfport Energy's recent bankruptcy proceedings. (ECF No. 262 at 1). This Court granted Plaintiffs' motion the following day. (ECF No. 264).

On December 1, 2021, Plaintiffs filed a Motion for Class Certification pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), seeking certification of the following class:

> All persons or entities who own oil and natural gas mineral interests in Belmont County, Ohio that entered into or who are parties or beneficiaries of oil and gas leases entered into with one or more of the Defendants named herein; in which leases the Lessor retained all rights to the formations and the hydrocarbon products contained in the formations below the base of the Utica Shale formation; where one or more of Defendants Rice, Gulfport, XTO, and Ascent have drilled and fractured their well(s) below the base of the Utica Shale formation; and where one or more of Defendants Rice, Gulfport, XTO, and Ascent are producing oil, natural gas, or other hydrocarbons from formations below the base of the Utica Shale formation without agreement from the Lessor.

(ECF No. 382 at 9). Plaintiff alleges that this matter involves more than 1,230 putative class members that entered into (or are successors-in-interest to) about 750 pooled oil and gas "class leases" with Defendants that contain the identical Grant and Reservation Clauses. (*Id.*; 401 at 11,

4

13).[1] Plaintiffs assert that these leases represent "31,492 acres of land in [224] pooled units owned by putative class members" wherein the Defendants "have drilled at least 365 wells into, and are producing oil and gas from, the Point Pleasant Formation (or below)." (ECF No. 382 at 17–18). Therefore, the 750 pooled leases at issue meet the proposed class definition. (ECF No. 401 at 11).

Under Ohio law, landowners can pool together adjoining properties to form a single drilling unit, and all production of oil, gas, or minerals from anywhere in the pooled drilling unit is considered to have been produced from the unit as a whole no matter where the actual well was drilled. *See* OHIO REV. CODE §§ 1509.26–.27. Upon forming a pooled unit, Defendants allocate revenue from the sale of oil and gas and pay royalties from any well drilled in that pooled unit based on a surface acreage allocation to the size of the pooled unit. (ECF No. 382 at 41). For example, if an oil and gas mineral owner owns 100 acres of a 600-acre pooled unit, a total of 1/6 of the revenue is allocated to said mineral owner and royalties are paid accordingly. (*Id.*).

Plaintiffs allege the following breakdown of responsibility among Defendants:

1. Defendant Ascent has included 73 parcels of land totaling 1,348 acres subject to the Class Lease form in thirty-four (34) pooled units wherein it has drilled and completed 62 wells into the Point Pleasant Formation and is producing oil and gas therefrom;

2. Defendant Gulfport has included 301 parcels of land totaling 6,771 acres subject to the Class Lease form in sixty-three (63) pooled units wherein it has drilled and completed 133 wells into the Point Pleasant Formation and is producing oil and gas therefrom;

3. Defendant XTO has included 75 parcels of land totaling 542 acres subject to the Class Lease form in nineteen (19) pooled units wherein it has drilled and completed 28 wells into the Point Pleasant Formation and is producing oil and gas therefrom; and

4. Defendant Rice has included 1,208 parcels of land totaling 22,831 acres subject to the Class Lease form in one hundred and eight (108) pooled units wherein it has drilled and

---

[1] Plaintiffs stipulate that one of the referenced leases does not include rights to the Marcellus Shale formation, but otherwise contains the same reservation language at issue related to the Utica Shale rock formation. (ECF No. 382 at 17 n. 14).

completed 142 wells into the Point Pleasant Formation and is producing oil and gas therefrom.

(ECF No. 382 at 18). Because Defendants' liability to the putative class turns on a common contract interpretation question of whether Defendants were limited to drilling in the Utica and Marcellus Shale and not the Point Pleasant Formation below, Plaintiffs maintain that the class action mechanism is most appropriate. (*Id.* at 10).

In February 2022, Plaintiffs filed three Motions to Strike expert testimony and declarations filed by Defendants to support their opposition to class certification. (ECF Nos. 396; 397; 408). The parties have submitted timely responses and replies to the Motion for Class Certification and the Motions to Strike. This Court held Oral Argument on Plaintiffs' Motion for Class Certification, and these matters now are ripe for review. (ECF No. 430).

## II. MOTIONS TO STRIKE

This Court **DENIES** all three of Plaintiffs' Motions to Strike as they relate to the class certification stage of the litigation. This Court does not rule on the merits of these reports and declarations as that should be assessed at a later stage of the litigation, if appropriate.

### A. Expert John McBeath (ECF No. 396)

#### 1. Parties' Arguments

Pursuant to Federal Rules of Evidence 702, 703, 403, and 104, Plaintiffs filed a motion to strike the opinion report of Defendants' expert, John McBeath, in opposition to Plaintiff's Motion for Class Certification. (ECF No. 396 at 1). McBeath's expert opinion assesses whether the facts surrounding the leasing of at-issue properties and production of oil and gas therefrom could assess the "claims and damages asserted by all putative class members." (ECF No. 387, Exh. 17). Plaintiffs allege that that Mr. McBeath's opinion testimony is related to the allocation of loss

among the putative class based on unstudied differences in pooling unit practices, well design, wellbore production, and physical invasion of each class members' property. (*Id.* at 3–4). Plaintiffs argue that Mr. McBeath offers opinions on the merits of liability and damage calculations, which are outside his professed area of expertise and based on legal conclusions provided to him by defense counsel. (*Id.* at 4–8; 12). Additionally, Plaintiffs argue that McBeath did not review the Class Lease forms, nor does he have the expertise to assess: (1) how or if some of the class members' properties were invaded by wells drilled or hydraulic fractures produced from well drilling; nor (2) the market value of gas produced to calculate damages. (*Id.* at 10–11).

Defendants assert that McBeath is a petroleum engineer with thirty years of experience in the field and that he reviewed "voluminous data" provided by counsel and which was publicly available. (*Id.* at 11, 13). Defendants asserts that Plaintiffs fundamentally misunderstand the role of merits analysis at the class certification stage, because Plaintiffs must demonstrate that their claims can be proven with common proof, not just pled. (ECF No. 417 at 1 (citing *Desai v. Geico Cas. Co.*, No. 1:19-cv-2327, 2021 WL 5762999, at *8 (N.D. Ohio Dec. 6, 2021)). Defendants maintain that the core of McBeath's opinion is that Plaintiffs failed to consider the individualized issues that arise from and predominate the claims. (*Id.* at 5). For example, Defendants allege that there are putative class members whose property is far from any wellbore and could not have suffered the torts alleged. (*Id.* at 6). Defendants also explain that McBeath's report raises well-specific and property-specific inquiries that must be conducted to assess Plaintiffs' tort actions: (1) the amount of hydrocarbons drained from the property; (2) the geological conditions of each property which would affect production; (3) from what depth the hydrocarbons were extracted; (4) property ownership at the time of the alleged wrong; and (5) the value of the hydrocarbons extracted over time to assess damages. (*Id.* at 7). Defendants argue that these necessary,

7

individualized inquiries which go to liability, not just damages, would predominate this case. (*Id.* at 6; 11).

Plaintiffs respond that the individualized inquiries are unnecessary since the properties are part of pooled units with a royalty distribution system already in place. Even if the individualized inquiries were required, Plaintiffs maintain that McBeath admitted to not conducting a complete analysis of the putative class wells, only identified five parcels that might have issues of common proof, and therefore, cannot provide a reliable assessment. (ECF No. 420 at 3). Even though he identified leases that do not have wellbore tracts through them, Plaintiffs argue that he failed to identify any single tract that he could definitively say did not suffer an invasion. (*Id.* at 4).

### 2. Standard of Review

Generally, "expert" testimony consists of opinions or commentary grounded in "specialized knowledge," that is, knowledge that is "beyond the ken of the average juror." *United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016); *see also* Fed. R. Evid. 702. The expert witness' opinion must satisfy the Rule 702 requirements of qualification, relevance, and reliability. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008). *Daubert* provides a "non-exclusive" checklist for a court to evaluate the reliability of expert testimony: "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community." *In re Scrap Metal*, 527 F.3d at 529. Most importantly, however, the foundation of an expert's opinion must be grounded in the actual facts of the case, valid according to the discipline that furnishes the base of special knowledge, and the expert appropriately "fits" the facts of the case into theories and methods the expert provides. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591–93 (1993).

8

It is well established that "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact," *see Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 516 (6th Cir. 1998), and that "rejection of expert testimony is the exception, rather than the rule." *In re Scrap Metal*, 527 F.3d at 529–30. The focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. Where a movant argues that the factual basis of an expert witness' opinion is weak, such an allegation should be treated as "bear[ing] on the weight of the evidence rather than on its admissibility." *McLean v. 98011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000). The party proffering the expert testimony must only demonstrate that by a "preponderance of proof" that the expert is qualified and that the testimony they provide will help the trier of fact dispose of the relevant issues in the case. *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000).

Neither the Supreme Court nor the Sixth Circuit have addressed the question of whether a district court must undertake a *Daubert* analysis at the class-certification stage where an expert's report is alleged critical to the class certification analysis. *Comcast Corp. v. Behrend*, 569 U.S. 27, 39–40 (2013) (Ginsburg, J. dissenting) (explaining how the Court granted certiorari to resolve the *Daubert* question at class certification but did not ultimately reach its merits); *Hicks v. State Farm Fire & Casualty Co.*, 965 F.3d 452, 465 (6th Cir. 2020) (explaining that application of *Daubert* at the class certification stage is unsettled). The Sixth Circuit, however, has not overruled a district court's decision to conduct a *Daubert* analysis where an expert's testimony was challenged at class certification. *In re Carpenter Co.*, No. 14-0302, 2014 WL 12809636, at *3 (6th Cir. Sep. 29, 2014) (finding that the district court did not abuse its discretion where it conducted a *Daubert* analysis of an expert's testimony deemed critical to class certification). Other circuits have taken different approaches. *Compare Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815−16 (7th Cir. 2010)

9

(requiring a district court to rule on challenges to an expert's qualifications if the expert's report is "critical to class certification"); *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015) (same); *with In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 612 (8th Cir. 2011) (approving certification without a full *Daubert* analysis and explaining the impracticalities of requiring a district court to consider the admissibility of evidence at class certification); *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1003 (9th Cir. 2018) (finding a district court abused its discretion by limiting its class certification analysis to review of admissible evidence only).

### 3. Court's Analysis & Findings

While this Court is not required to conduct a *Daubert* analysis, McBeath's expert report does address the issues of commonality and predominance, which are critical to this Court's assessment of class certification. Additionally, because this is the class certification stage, Plaintiffs do not have the opportunity to cross examine the reliability of McBeath's report like they would during trial, so this Court will review McBeath's qualifications and the applicability of his analysis to this case.

First, this Court finds that McBeath has the requisite "knowledge, skill, experience, training, or education" to conduct this analysis. Fed. R. Evid. 702. McBeath has worked in the field of petroleum engineering for thirty years, and currently works as a petroleum engineer and geological consultant. (ECF No. 387, Exh. 17 at 2). He has a Bachelor of Science in Petroleum Engineering, is a member of several petroleum-related professional societies, and has testified on fuel as an expert in numerous lawsuits. (*Id.*). Relevant to this case, McBeath frequently reviews other oil and gas leases to assess them for maintenance obligations, royalties owed based on production, and the value of oil and gas produced. (*Id.* at 18).

It is well-established that an expert witness' testimony is not required to be based on scientific analysis alone, however, but can be based on technical or other specialized knowledge. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141–42 (1999) (finding that *Daubert* analysis applies to the testimony of engineers and other experts who are not scientists). In these situations, a court is not required to apply the *Daubert* reliability factors as a "definitive checklist or test," because a court's gatekeeping inquiry must be tied to the facts of a particular case. *Id.* at 150 (citing *Daubert*, 509 U.S. at 591–93) (internal quotations omitted).

The *Daubert* reliability factors are unhelpful here because McBeath's expert testimony derives largely from his own practical experiences throughout thirty years as a petroleum engineer. *See First Tenn. Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001) (concluding that the district court did not err when it found the expert testimony of a banking expert reliable and relevant based on his years of experience in the industry). These types of opinions to not lend themselves easily to scholarly review or to traditional scientific evaluation. McBeath's expert report is reliable because it is based on his years of experiences, knowledge about petroleum production, and review of other, similar leases and contracts that deal with oil and gas production. Additionally, his summary of the individual inquiries that must be conducted to understand the Defendants' liability are relevant to determining the commonality and predominance prongs of Federal Rules of Civil Procedure 23. McBeath's report does contains legal conclusions that are not within his area of expertise to make, and it is the job of this Court, not an expert witness, to make those conclusions. This Court does not discern one way or the other as to the correctness of McBeath's opinion, but this Court is tasked only with assessing the soundness of his testimony. This Court only uses the factual information provided in McBeath's report to arrive at a conclusion regarding class certification, and Plaintiffs' Motion is **DENIED**. (ECF No. 396).

11

**B.      Declarations of Lucas Herren and Matt Reser (ECF Nos. 397; 408)**

*1.  Parties' Arguments*

Plaintiffs filed two very similar Motions to Strike the Declarations of Lucas Herren (ECF No. 397) filed by Defendant XTO and Matt Reser (ECF No. 408) filed by Defendant Ascent in opposition to class certification. Mr. Herren and Mr. Reser are corporate representatives of Defendants XTO and Ascent. The first motion deals with a Joint Stipulation of Facts (ECF No. 368) entered into by Plaintiffs and XTO and Herren's Declaration (ECF No. 391-1). The second motion deals with a second Joint Stipulation of Facts (ECF No. 354) entered into by Plaintiffs and Ascent and Reser's Declaration (ECF No. 390-1).

In both joint stipulations, the parties agreed to: (1) certain language regarding the lessor's reserved rights to produce from certain shale formations; (2) which pooling units all leases and oil and gas wells were located; and (3) information about the identity of the current landowners of the leases at issue. (ECF Nos. 354; 368). The Declarations include information about each representative's background, the Defendants' relationship with the named Plaintiffs, and the leases they contain with the disputed Reservation Clause. (*Id.*). Plaintiffs allege, however, that in October 2020 they requested admissions from both Defendants that certain lessors own oil and gas rights subject to the leases at-issue and that the net mineral acreage for said lessors was accurate. Defendants objected to providing that information but told Plaintiffs during the depositions of Herren and Reser that joint stipulations would address this information. The joint stipulations were entered into in October 2021. Plaintiffs, however, now allege that Defendants included new information in the declarations that conflicts with the stipulations and that they failed to provide to Plaintiffs prior to the close of discovery in November 2021.

Defendants argue that striking the declarations is unwarranted because they do not conflict with the joint stipulations and the information provided in the declarations was available through discovery. Plaintiffs reply that conflicts between the declarations and stipulations exist, such as the allegation that some of the leases held by Defendants have been amended to exclude the Reservation Clause. Plaintiffs also maintain that the declarations reference documents not provided to them in discovery and do not specify which leases have been amended.

### 2. Standard of Review

Federal Rule of Civil Procedure 26(e) requires a party who made a discovery disclosure under Rule 26(a), to supplement or correct those disclosures: (1) in a timely manner if a material correction to that information is need; or (2) if ordered by a court. Fed. R. Civ. P. 26(e). Federal Rule of Civil Procedure 37(c) states that "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c). This Court must consider the following factors when assessing whether an allegedly late or omitted disclosure was substantially justified or harmless:

> (1) the surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Howes v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015). There is no requirement, however, to submit a supplemental disclosure for information already revealed by a witness in a deposition or otherwise through formal discovery." *Abington Emerson Capital, LLC v. Adkins*, No. 2:17-cv-0142, 2021 WL 611998, at *14 (S.D. Ohio Jan. 22, 2021) (Morrison, J.) (quoting 8C Wright & Miller, Fed. Prac. & Proc. § 2049.1 (3d ed. 2010)).

13

### 3. Court's Analysis & Findings

Rule 26(e) is inapplicable to Plaintiffs' assertions. The joint stipulations entered into by the parties are generic, and do not include the level of specificity claimed by Plaintiffs. For example, Paragraph 1 of Ascent's Joint Stipulation with Plaintiffs only agrees that the leases listed in Exhibit A include the Reservation Clause. It does not state that the leases are owned by Ascent, that the leases are current, nor that the leases have not been amended, such that it would conflict with Reser's Declaration. Similarly, Paragraph 2 states that the oil and gas wells in Exhibit B are located within the drilling units listed in Exhibit D. It does not discuss whether the wells are subject to the class leases, whether the wells are producing, nor whether the wells are in units with putative class leases. The facts outlined in the declarations simply do not conflict with the Stipulations, and Plaintiffs fail to connect the dots between the alleged conflicts and their claimed conclusions.

Additionally, Defendants demonstrate through their exhibits that the information included in their declarations were provided to Plaintiffs in discovery or was accessible through public information. Therefore, Plaintiffs had the ability to cure this alleged "surprise" and Defendants had no responsibility to supplement the stipulations because they had already provided this information to Plaintiffs. *Howes*, 801 F.3d at 748. If, as Plaintiffs state, Defendants improperly refused to provide discovery, that is an issue that can be resolved through a motion to compel. Plaintiffs' Motions to Strike the Declarations are **DENIED**. (ECF Nos. 397; 408).

### III. CLASS CERTIFICATION

### A. Inclusion of Defendants Ascent and XTO in Plaintiffs' Claims

#### 1. Defendants Ascent and XTO's Arguments

As a threshold matter, Defendants Ascent and XTO argue that they are not parties to the class leases, and therefore, the class definition cannot be applied to them. Specifically, Defendant

14

Ascent alleges the following: (1) the Butlers' and Feiocks' claims against Ascent were dismissed; and (2) the Passmore and Schusters' leases are not held by Ascent or in Ascent operated pooling units. (ECF No. 390 at 3–6). Similarly, Defendant XTO asserts that there are only four leases held by XTO with six associated lessors, that could arguably qualify as putative class members. (ECF No. 391 at 6). XTO alleges that the current lessors of two of the leases are successors to the leases and XTO only holds a 5% interest in the other two leases that it acquired through subsequent assignment of the lessee designation to XTO and does not operate or drill on that property. (*Id.*). XTO asserts that these leases do not meet the proposed class certification definition of individuals who "entered into" leases with the defendants. (*Id.* at 7). Second, Defendant XTO asserts that: (1) because the Schusters' tracts are not wellbore tracts, no drilling occurred beneath the Schusters' property within the XTO's pooled units; and (2) XTO is only the operator, not the lessee of the Passmore and Schuster leases. (*Id.* at 9–10).

### 2. *Standard of Review*

Typically, in ruling on a motion for class certification, a district court should not consider the merits of the plaintiffs' claims. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974). That said, on occasion, "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," *see Gen. Tele. Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982), and "rigorous analysis" may involve some overlap between the proof necessary for class certification and the proof required to establish the merits of the plaintiffs' underlying claims. *Wal-Mart Store, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011). A court, however, should not conduct free-ranging merits inquiries at this stage, but may consider the merits only to the extent "they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, 568 U.S. 455, 466 (2013).

15

### 3. Court's Analysis & Findings

Here, it is necessary to consider the merits of Plaintiffs' claims to address whether Defendants Ascent and XTO should be defendants under the proposed class definition. A previous ruling by this Court at the motion to dismiss stage proves instructive:

> XTO and Ascent argue that because they are not parties to the leases, they have no stake in a declaratory judgment as to the scope of the leases. That is only partially true. XTO and Ascent have agreements with Rice to drill wells on the J&R Passmore and Schuster properties. As a result, there remains an "actual case or controversy" regarding the scope of XTO's and Ascent's drilling rights vis-à-vis these properties. Thus, XTO and Ascent have a stake in any declaratory judgment that might issue with respect to the J&R Passmore and Schuster leases because that judgment has the potential to determine the scope of their drilling rights . . . .
>
> In arguing that Plaintiffs lack standing, XTO and Ascent rely on the fact that Plaintiffs have not entered into any leases with XTO or Ascent. This is irrelevant . . . if XTO or Ascent has been involved in drilling on Plaintiffs' land beyond the scope of the leases, they are potentially liable in tort . . . Tort liability is not dependent on a contractual relationship.

*J&R Passmore, LLC v. Rice Drilling D, LLC*, No. 2:18-CV-1587, 2019 WL 6051112, at *2–4 (S.D. Ohio Nov. 15, 2019) (Morrison, J.). At the motion to dismiss stage, this Court maintained Passmore and the Schusters' claims against Ascent and XTO because under Ohio law, parties who have entered into a joint venture are "liable for the negligent and tortious acts of the other members, pursuant to the venture, that result in injury to third persons." *Hulett v. Am.'s Finest Serv. Co.*, No. 1:03-cv-2497, 2005 WL 2233261, at *12 (N.D. Ohio Sept. 14, 2005). To establish a joint venture, Plaintiffs must prove five things:

> (1) there is a joint contract; (2) Defendants intended to form a joint venture; (3) there exists a "community of interest and control, including contributions to the joint venture"; (4) Defendants have "the mutual right to direct and control the purpose of the joint venture"; and (5) Defendants have agreed to share in the profits and the losses.

16

*Anchor v. O'Toole*, 94 F.3d 1014, 1024 (6th Cir. 1996). While Defendants Ascent and XTO point to a provision in their operating agreement expressly stating their relationship did not constitute a joint venture, under Ohio law, a joint venture is nothing more than an agreement "'to carry out a common business purpose.'"[2] *Schlaegel v. Howell*, 42 N.E.3d 771, 777 (Ohio Ct. App. 2015) (quoting *Nilavar v. Osborn*, 711 N.E.2d 726, 738 (Ohio Ct. App. 1998)). In this Court's previous ruling, *see J&R Passmore*, 2019 WL 6051112, at *2–4, and in a substantially related case brought against the same defendants, *see TERA II, LLC v. Rice Drilling D, LLC*, 2019 WL 6051115, at 7–8 (S.D. Ohio, Nov. 15, 2019) (Morrison, J.), this Court found that Plaintiffs had sufficiently pled existence of a joint venture. Following that logic, under the Ohio Joint Tortfeasor Act, Defendants Ascent and XTO could be held jointly and severally liable for compensatory damages on Plaintiffs' intentional tort claims. OHIO REV. CODE § 2307.22(A)(3). It is immaterial whether these defendants have physically trespassed on Plaintffs' properties . . . because J&R Passmore and the Schusters have alleged that one of [defendants'] alleged co-adventurers, [ ], did so." *J&R Passmore*, 2019 WL 6051112, at *7.

Setting aside the fact that XTO does hold some of the at-issue leases and misrepresents the proposed class definition, the proposed class explicitly includes Defendants Ascent and XTO:

> [W]here one or more of Defendants . . . have **drilled and fractured** their well(s) below the base of the Utica Shale formation; and where one or more of Defendants . . . are **producing** oil, natural gas, or other hydrocarbons from formations below the base of the Utica Shale . . . .

---

[2] XTO and Ascent specifically state in their contract that they are not entering into a joint venture, but the Court finds that argument unpersuasive. *See Ringier Am., Inc. v. Land O'Lakes, Inc.*, 106 F.3d 825, 829 (8th Cir. 1997) ("[T]he contractual disclaimer is not dispositive"). Additionally, "[a]s this Court previously observed, the question of whether a joint venture exists is a question of fact for the jury." (ECF No. 82).

(ECF No. 382 at 9 (emphasis added)). This Court does not assess at this stage whether Ascent and XTO should, in fact, be held as joint tortfeasors. Once it is determined whether defendants had the right to drill into the Point Pleasant Formation, however, a jury may need next to assess Plaintiffs' tort claims. Because this Court found plausible that Rice, Gulfport, Ascent, and XTO all have business agreements to drill wells and share in the production revenues pursuant to these agreements, a joint tortfeasor analysis is warranted. Therefore, Defendants Ascent and XTO are appropriately included as Defendants at the class certification stage.

### B.     Standard of Review

Plaintiffs seek certification of the proposed class under Federal Rules of Civil Procedure 23(a) and 23(b)(3). A plaintiff seeking class certification must establish compliance with all four requirements of Rule 23(a): "(1) numerosity, (2) commonality, (3) typicality, and (4) adequacy." Fed. R. Civ. P. 23(a); *Alkire v. Irving*, 330 F.3d 802, 820 (6th Cir. 2003). In ruling on a motion for class certification, a district court typically should not consider the merits of the plaintiffs' claims, but the court may consider evidence outside of the pleadings to determine whether the prerequisites of Rule 23 are met. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974).

In addition, under Rule 23(b)(3), class certification is appropriate if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3) (referred to by the shorthand of "predominance and superiority"). Additionally, even though Rule 23 has no express ascertainability requirement, many courts, including the Sixth Circuit, have held that it is implicitly required for class certification. *Cole v. Memphis*, 839 F.3d 530, 541 (6th Cir. 2016); *see also Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013). Ascertainability is met where the "class

18

description [is] sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Cole*, 839 F.3d at 541 (quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012)).

### C. Class Certification – Rule 23(a)

#### 1. Numerosity

Plaintiffs argue that because the current class size contains 1,232 members, the proposed class easily meets the numerosity required by Rule 23(a)(1) and surpasses the size of other classes certified by the Sixth Circuit. (ECF No. 382 at 23–24). While Defendants did not address numerosity outright in the briefing, during Oral Argument, Counsel for Ascent and XTO argued that numerosity was not met for those defendants because: (1) there is no class representative who fits the class definition as to Ascent; and (2) Defendant XTO asserts that there are only four leases held by XTO, that could arguably qualify as putative class members.

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The Sixth Circuit has recognized that, the "sheer number of potential litigants in a class, especially if it is more than several hundred, can be the only factor needed to satisfy Rule 23(a)(1)." *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 570 (6th Cir. 2004); *see also Snelling v. ATC Healthcare Servs. Inc.*, No. 2:11-cv-983, 2012 WL 6042839, at *5 (S.D. Ohio Dec. 4, 2012) (Often, "a class of 40 or more members is sufficient to meet the numerosity requirement."). While there is no strict numerical test, "substantial" numbers usually satisfy the numerosity requirement. *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006) (finding that a proposed class of thousands of individuals met the numerosity requirement).

Plaintiffs base their proposed class size on the number of lessors tied to the Class Leases that contain the at-issue Reservation Clause. The proposed class is sufficiently numerous that

joinder of all members would be impracticable. *Raymond v. Avectus Healthcare Solutions*, LLC, No. 1:15-cv-559, 2020 WL 3470461, at *4 (S.D. Ohio Mar. 27, 2020). As it relates to Defendants Ascent and XTO, this Court is persuaded that it would also be impracticable for the royalty owners of the 148 leases where XTO and Ascent have either drilled or operated wells (reasonably assumed to exceed 150 individual lessors) to be joined together to adjudicate the claims for alleged tortious conduct committed within the Defendants' joint venture. (ECF No. 401 at 65). Even though this number is much smaller than the overall putative class, it still far surpasses the numerosity requirements set out by the Sixth Circuit. Therefore, Plaintiffs have met the requirements for numerosity under Federal Rules of Civil Procedure 23(a).

### 2. *Commonality*

#### a. *Plaintiffs' Arguments*

Plaintiff argues that there is one common legal issue in this case: "whether the applicable lease language reserved the oil and gas in the formations below the Utica Shale to Plaintiffs and the putative class members." (ECF No. 382 at 25). Plaintiffs allege that members of the putative class have suffered the same injury, maintaining that each of the 365 wells across the 750 leases have drilled and extracted oil and gas from the Point Pleasant Formation. (*Id.* at 26; 401 at 53). Additionally, Plaintiffs assert that Defendants' affirmative defense that the intent of the parties during negotiation of the original leases differed is not a reason to deny class certification. (ECF No. 401 at 56 (citing *Zehentbauer Family Land LP v. Chesapeake Expl. LLC*, 935 F. 3d 496, 506 (6th Cir. 2019) (liability under a standard form contract runs on the court's interpretation of the lease language under Ohio law, not transaction-specific facts of each contract)). Instead, Plaintiffs implore this Court to look to Ohio law to determine the intent of the contract, as intent is presumed to reside within the language of the common lease form.

20

### b. *Defendants' Arguments*

Defendants argue that Plaintiffs frame this case as a contract interpretation issue and fail to address two fundamental flaws in their arguments. First, Defendants assert that this is not a breach of contract case, but an intentional tort case, and the intent of the parties to the original leases is a defense to Plaintiffs' claims. (ECF No. 387 at 11). Defendants allege that the representative Plaintiffs were not part of contract negotiations, and their interpretation of the intent of the contract language is the opposite of what other members of the putative class intended when signing the leases—to permit production from the Point Pleasant Formation. (*Id.* at 15). Defendants maintain that the question of intent of the original leaseholders and current leaseholders also is a highly individualized inquiry that requires this Court to look at evidence outside the four corners of the lease. (*Id.* at 12–13; ECF No. 401 at 55). To determine what geological formations the parties intended the Utica Shale to include, extrinsic evidence must be examined, Defendants argue. (ECF No. 387 at 13). Defendants point to testimony from lessors and Plaintiffs' own expert to demonstrate that "Utica Shale" was understood in the industry at that time to include the Point Pleasant Formation. (*Id.* at 15–16). Defendants allege that this context is important because it demonstrates that the "intent of any given putative class member is a highly individualized question." (*Id.* at 16).

Second, as presented thoroughly during oral argument, Defendants allege that the commonality prong of Rule 23(a) requires that Plaintiffs' injury is capable of being established by common proof. Because the claims for which Plaintiffs' seek damages are trespass, conversion, and unjust enrichment—all of which require individualized proof of possession—Defendants assert that Defendants' liability to the members of the putative class cannot be determined based on common proof.

21

*c. Court's Analysis & Findings*

The second criterion of Rule 23(a) requires that the case present issues of law or fact common to the class. There "need only be one question common to the class, [but] that question must be a 'common issue the resolution of which will advance the litigation.'" *Alkire v. Irving*, 330 F.3d 802, 820 (6th Cir. 2003) (quoting *Sprague v. GMC*, 133 F.3d 388, 397 (6th Cir. 1998)). "Cases alleging a single course of wrongful conduct are particularly well-suited to class certification." *Powers*, 501 F.3d at 619. As explained succinctly by the Sixth Circuit, "named plaintiffs must show that there is a common question that will yield a common answer for the class (to be resolved later at the merits stage), and that that common answer relates to the actual theory of liability in the case," *see Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 505 (6th Cir. 2015), from which the putative class members have suffered the same injury. *Dukes*, 564 U.S. at 349–50.

As explained *supra*, a court may consider the merits where relevant to determine if the Rule 23 prerequisites for class certification are satisfied. *Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, 568 U.S. 455, 466 (2013). The parties dispute whether contract interpretation or analysis of a tort lies at the center of this litigation. Should this Court ultimately address the merits of Plaintiffs' claim, it will have to consider both contract and torts issues in a two-step process. In addressing the contractual legal questions at issue here, this Court previously stated:

> There are two possible ways that the Court can decide [the declaratory judgment] claim—Defendants had the right to drill the Point Pleasant formation under the terms of the leases, or they did not. If the Court decides the former, the leases encompass the Point Pleasant formation, and the Defendants will have acted within the scope of the leases and will have violated no duty to Plaintiffs. If the Court decides the latter, the leases do not apply, and Defendants' conduct is governed by the common law.

*J&R Passmore, LLC*, 2019 WL 6051112, at *5. Within this question is another: whether the Point Pleasant Formation is considered generally part of the Utica Shale. This litigation either ends with

22

the resolution of these questions or allows Named Plaintiffs to move forward on their intentional tort claims to determine Defendants' liability to them. The interests and claims of the various plaintiffs need not be identical, because "the commonality test is met where at least one issue whose resolution will affect all or a significant number of the putative class members" exists. *Amos v. PPG Indus., Inc.*, No. 2:05-cv-70, 2018 WL 5259579, at *5 (S.D. Ohio Jan. 5, 2018). While the question of intent in the contract negotiations may well be important when the merits are addressed, the Plaintiffs here have met the commonality requirement by demonstrating that answering one, central question will impact all class members.

At base, the resolution of the question of whether Defendants exceeded the scope of the leases by drilling into the Point Pleasant Formation will advance the litigation by either establishing that Defendants could be held liable or relieving Defendants of their alleged liability. Therefore, Plaintiffs meet the commonality prong of Rule 23(a).

### 3. Typicality & Adequacy

Given the substantial overlap in the evidence asserted by both parties to support their positions on the typicality and adequacy requirements, this Court will address them together.

#### a. Plaintiffs' Arguments

Plaintiffs allege that each putative class member's claim, just as Plaintiffs', is identical because the leases all contain the same Reservation Clause. (ECF No. 382 at 27). Therefore, Plaintiffs argue, a common nucleus of facts and course of conduct is established for this Court to review under a common legal theory. (*Id.* at 28). Plaintiffs maintain that standard form contracts should be interpreted uniformly, and are therefore, appropriate for class treatment. (*Id.*).

Second, Plaintiffs argue that they have no conflict with the putative class and actively participated in the litigation through depositions, answering discovery requests, and assisting

counsel. (ECF No. 382 at 30). Plaintiffs also argue that just because the Defendants may have different defenses to the named Plaintiffs' claims, does not create conflicts of interest between the named Plaintiffs and putative class. (ECF No. 401 at 38–39).

Third, Plaintiffs maintain that Defendants' assertion that there is potential intra-case conflict with another matter pending before this Court is inaccurate. (ECF No. 401 at 39). Plaintiffs explain that the *Gregor* case poses a different theory of liability—namely that Defendants have violated the terms of the leases that apply to the Point Pleasant Formation where Defendants have failed to pay royalties for drilling from that formation. (*Id.* (citing *Gregor v. Rice Drilling*, No.2:21-cv-3999 (S.D. Ohio)). Plaintiffs argue that whether this Court ultimately concludes that Plaintiffs here conveyed the Point Pleasant Formation to defendants in the class leases, the Plaintiffs in *Gregor* are still entitled to the full value of royalties from said formation. (*Id.* at 40).

Finally, Plaintiffs also maintain that their counsel is highly qualified to litigate this matter. Plaintiffs' Counsel have spent four years investigating the facts, consulting with experts, and analyzing the data necessary to prosecute the case, and have many years' experience litigating oil, gas, and energy disputes in Ohio and against similar defendants. (ECF No. 382 at 34).

### b. *Defendants' Arguments*

Defendants counter that "[t]his lawsuit is the brainchild of putative class counsel who, after a solicitation campaign, identified a handful of class representatives willing to claim they never intended the leases to permit drilling into the Point Pleasant—while, in reality, none of them had any intent because they were never involved in negotiating the lease language at issue." (ECF No. 387 at 19–20). Defendants argue that Plaintiffs' claims "stand[] in stark contrast to the intent" of the original landowners when they negotiated the leases with Rice and the current intent of many lessors and members of the putative class. (ECF No. 387 at 20). Defendants assert that Plaintiffs

24

fail the adequacy prong because potential class members have filed eight separate lawsuits. This includes a putative class action in which the proposed class is identical to the class proposed here, in which they seek to enforce their leases and receive royalties from Defendants Gulfport and Rice's drilling activities. (ECF No. 389 at 12 (citing *Gregor*)). Defendants assert there is a direct conflict of interest between Named Plaintiffs who seek damages and potential putative class members who wish to maintain their business relationship with defendants. (*Id.* at 15).

### c. Issues with Plaintiffs' Counsel

Defendants Gulfport also maintain that Mr. Craig Wilson, Plaintiffs' Counsel, was involved in drafting the leases during the original negotiations between Larry Cain of the Smith-Goshen Group (original landowners) and Rice and could be called as a fact witness in the present matter. (ECF No. 389 at 16). Defendant Gulfport argues that combining the roles of advocate and witness can prejudice the tribunal, causes a conflict of interest, and would result in Mr. Wilson being inadequate counsel for the Plaintiffs. (*Id.*). Second, Defendants Gulfport allege that Mr. Wilson solicited Named Plaintiffs for pecuniary gain, even though he had spoken with the parties originally involved in negotiating the leases who disagreed with him about his legal theories in this case. (*Id.* at 17–21). During oral argument, Plaintiff responded that Mr. Wilson played a minimal role in the initial negotiations and drafting of the original leases as a law clerk in the retained law firm for one of the parties at the time. Given his limited role, Plaintiffs assert that Mr. Wilson has no substantive conflicts of interest with the putative class and is competent to represent the class.

Finally, Defendants Gulfport allege that Mr. Wilson misled the Bankruptcy Court of the Southern District of Texas during Chapter 11 voluntary proceedings filed by Defendant Gulfport Energy by filing Proofs of Claim on behalf of the proposed putative class members, representing

to the court that the class had been certified and discussed the proof of claims with each class member. (*Id.* at 20–21). Defendants Gulfport cite to the record of a hearing before the Bankruptcy Court, which chastised Mr. Wilson for his false representations to the court and threatened referral to the United States Attorney for bankruptcy fraud. (*Id.* at 21). Plaintiffs assert that these allegations are an irrelevant, personal attacks against Mr. Wilson. (ECF No. 401 at 49). They counter that Mr. Wilson followed the appropriate filing procedure and filed a conditional class proof of claim with the bankruptcy count on behalf of a putative class that could later be certified. (*Id.* at 50). Plaintiffs argue that Mr. Wilson was only chastised by the court in an attempt to discourage him from his pursuit of a potential class in Gulfport's bankruptcy proceedings, which the court deemed too complicated already. (*Id.*).

Additionally, Defendants allege that named Plaintiffs and some 116 putative class members' prior involvement in said bankruptcy proceedings creates a conflict of interest between them and the putative class. (ECF No. 389 at 10–11). Plaintiffs respond that they and the 116 members of the putative class withdrew their bankruptcy proof of claims and discharged their claims against Gulfport. (ECF No. 401 at 68). Further, Plaintiffs argue that this dispute is inappropriate for class certification and should be dealt with at summary judgment. (*Id.* at 68–69).

### d. Issues Related to Specific Defendants

As detailed *supra*, Defendants Ascent and XTO argue that they are not parties to the class leases, and therefore, the class definition must be analyzed differently with respect to them. Due to their minimized role as lessees and more substantial role as operators, Defendants Ascent and XTO argue that typicality is destroyed, and Named Plaintiffs will not be motivated to advance the interests of the putative class members against them. (ECF No. 390 at 4–5). For example, XTO argues that the Named Plaintiffs are in markedly different positions from those lessors beneath

whose property wellbores were actually drilled and with whom XTO does not have an operating agreement. (*Id.* at 9–11). XTO also argues that the leases entered into by Passmore within the Joint Operating Agreement ("JOA") have no depth restrictions, making them fundamentally different from the at-issue leases with Reservation Clause. (ECF No. 391 at 8–9).

Plaintiffs argue, however, that Rice, Gulfport, XTO, and Ascent are joint venturers in drilling and producing gas from the Point Pleasant Formation below Plaintiffs' and absent class members' mineral estates. (ECF No. 401 at 59). Plaintiffs maintain that "the class sought does not rise and fall with whether a class representative or putative member has a lease or has property subject to a well operated by a particular party Defendant." (*Id.*). Plaintiffs allege that XTO operates some of the land held by Passmore and the Schusters under the class leases with a Reservation Clause, Ascent drills on some of their property, and both XTO and Ascent have leases with the Reservation Clause that have been placed in pooled units with leases held or placed into pooled units operated by XTO. (*Id.* at 60). Specifically, Plaintiffs allege that Ascent has included 73 parcels of land totaling 1,248 acres subject to the Class Lease form in 34 pooled units, where it has drilled and completed 62 wells into the Point Pleasant Formation and from which it is producing oil and gas. (*Id.* at 62). They also allege that XTO has 75 parcels of land totaling 542 acres subject to the Class Lease form in 19 pooled units wherein it has drilled and completed 28 wells into the Point Pleasant Formation and from which it is producing oil and gas. (*Id.*).

### e. Issues Related to Specific Named Plaintiffs

Defendants argue that some of named Plaintiffs have unique situations that make their claims atypical from those of the remainder of the putative class and that results in conflicts of interest that undermine their ability adequately to represent the class.

First, Defendants note that Passmore has a conflict of interest because it entered into contracts with Defendant XTO that give it a working interest in and revenue from drilling and production in the Point Peasant Formation. (ECF No. 387 at 21–23). Therefore, Defendants argue, the putative class would have the same claim against Passmore as other defendants, putting it directly in conflict with the putative class. (*Id.* at 22). Plaintiffs reply that their claims are not in conflict with the class because they have only received royalties from the production of the Heller A and B pooled units within which they have leases. (ECF No. 401 at 42). Passmore maintains that the estates from which it receives royalties were relinquished to Defendants which now "own" the working interests in those properties. (*Id.* at 42–44). Because XTO and Ascent own the working interests to those leases, Passmore holds no liability for the unlawful drilling on those properties (known as the "Heller Units"). Additionally, Passmore maintains that when it committed its leases to Defendants it did not authorize them to drill into the Point Pleasant Formation. (*Id.* at 41).

Second, Defendants argue that Ohio law requires parties alleging trespass, conversion, and unjust enrichment to have a possessory interest in the objects of their claim. (ECF No. 387 at 24). Defendants allege that the Butlers and Schusters only had remainder, non-possessory interests in at least one of the leases at issue at the relevant times. (*Id.* at 25–27). Defendants argue that Supreme Court precedent requires the class representative to possess the same interest and suffer the same injury as the class members, and as remainder men, the Butlers cannot suffer any injury where they lack a possessory interest in the property. (*Id.*). Therefore, the Defendants argue that the Butlers' and Schusters' claims are not typical of the class because they lack any claim to the relief requested, and they have no incentive to pursue the claims of the absent class members. (*Id.* at 26–27). Plaintiffs respond that both the Butlers and Schusters obtained possessory interest in the leases, so no argument remains that their claims are atypical of the class. (ECF No. 401 at 48).

28

Defendants also assert that the Schusters and Feiocks assert a claim in conflict with the intent of the original lessors and the terms of some of the current leases they hold. First, Defendants allege that the Feiocks claim the opposite intent for their leases from the Nardos, the original signatories of one of the Feiocks' leases. (ECF No. 387 at 28–29). Second, Defendants argue that some of the Schusters' leases were previously amended to allow Defendants to produce gas from the Point Pleasant Formation. (ECF No. 387 at 27–28).

Plaintiffs respond that Defendants' allegations about the Feiocks are unfounded. (ECF No. 401 at 46). Plaintiffs assert that the Feiocks have two leases with Reservation Clauses: (1) one lease they signed with Defendant Rice in 2013; and (2) another they acquired from the Nardos in 2016. (*Id.*). Plaintiffs argue that Defendants cannot attack the typicality and adequacy of the 2013 plot because it fits within the proposed class definition. (*Id.*). Plaintiffs also assert that Defendants misrepresent the facts surrounding the 2016 plot—namely that the Nardos did not own nor did they receive royalties from production tied to property on which the trespass occurred, and therefore, do not take a specific view on the merits of Plaintiffs' claims. (*Id.* at 47).

Plaintiffs argue that Defendants' claims about the Schusters' intent are meant only to distract. (*Id.*). The Schusters have entered into five leases with Rice, two of which were assigned to XTO. (*Id.*). Plaintiffs allege that the Schusters only agreed to amend two of the leases to grant XTO the rights to drill in the Point Pleasant Formation because XTO told them they were restricted from drilling based on the terms of the original leases. (*Id.*). Plaintiffs acknowledge that those two leases will not fall into the class definition, and do not constitute a conflict of interest. (*Id.* at 48).

### f. *Court's Analysis & Findings*

Under Rule 23(a)(3), the "claims or defenses of the representative parties" must be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). A class representative's claim is

typical if "it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and the claims are based on the same legal theory." *Id*. Importantly, "[t]ypical does not mean identical, and the typicality requirement is liberally construed." *Id*. Further, the harm suffered by named plaintiffs "may differ in degree from that suffered by other members of the class so long as the harm suffered *is of the same type*." *Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58, 65 (S.D. Ohio 1991) (certifying a class alleging claims for, inter alia, negligence, private nuisance, and willful and wanton misconduct under Ohio law).

Despite the parties substantial briefing on this question, this Court finds the typicality requirements rather straight forward here. First, Plaintiffs satisfy the typicality requirement for the same reasons that they satisfy the commonality requirement: because their claims derive from the same conduct by the Defendants and the same question of whether the Defendants' conduct is within the scope of the leases negotiated. *See Swigart v. Fifth Third Bank*, 288 F.R.D. 177, 185 (S.D. Ohio 2012) ("The requirement of typicality focuses on the conduct of a defendant and whether a proposed class representative has been injured by the same type of conduct alleged against the defendant as other members of the proposed class. This is why a finding that commonality exists generally results in a finding that typicality also exists."). Named Plaintiffs assert that they and all absent class members were adversely affected by the Defendants' decision to drill, produce, and/or profit from gas and oil extracted from the Point Pleasant formation.

While Defendants raise several defenses specific to the Named Plaintiffs such as when possessory interest in the property was acquired by the Named Plaintiffs and that the Reservation Clauses of some leases have been amended, these issues do not encompass all of the leases that the Named Plaintiffs argue were improperly drilled. In *In re Cardizem CD Antitrust Litig.*, the Eastern District of Michigan concluded that the potential availability of a unique defense against

30

certain Named Plaintiffs does not destroy typicality where those defenses will not "skew the focus of the litigation" or cause the absent class members to suffer because the Named Plaintiff is "preoccupied with defenses unique to it." 200 F.R.D. 297, 304–05 (E.D. Mich. 2001). Defendants' party-specific allegations only attempt to distract this Court from the fact that each Named Plaintiffs allege that he or she suffered the same harm as the putative class for at least one of the leases he or she holds and seeks to address that harm. Where Defendants' unique defenses against the Named Plaintiffs prove successful, those leases will not be included in the final class.

To establish the prerequisite of adequacy, Plaintiffs must show that they, as "the representative parties[,] will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Under Rule 23, the named Plaintiffs must belong to the class, have the same interest as the class, and suffer the same injury as the class members. *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997). The Sixth Circuit has stated that it "reviews the adequacy of class representation to determine whether [1] class counsel are qualified, experienced and generally able to conduct the litigation, and [2] whether the class members have interests that are not antagonistic to one another." *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000). Finally, it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel. *Cmty Refugee & Immigration Servs. v. Registrar, Ohio Bureau of Motor Vehicles*, 334 F.R.D. 493, 506 (S.D. Ohio 2020). Counsel is qualified if they are experienced and generally able to conduct the litigation. (*Id.*).

Named Plaintiffs have remained involved in the litigation to-date and they understand their fiduciary responsibility to the absent class members. (ECF No. 382 at 30–34). Class Counsel Craig Wilson, John McCuskey, Brian Warner, and J. Robert Russell will vigorously prosecute this matter. (*Id*. at 35). Together, these four attorneys have extensive experience representing Ohio

31

landowners with oil, gas, and mineral issues; won jury verdicts for unlawful trespass against Defendants Rice and Gulfport in related state court litigation; actively litigated professional negligence cases related to coal, gas, and energy law; and have several decades of experience representing mineral owners against EQT, Defendant Rice's parent company. (*Id.* at 36).

As this Court held in *Boggs v. Divested Atomic Corp.*, "people and parcels of real property, like snowflakes, necessarily have different and unique characteristics. The important question [for the purposes of Rule 23(a)(4)] is to what extent those differences, when compared to the nature and extent of the shared characteristics of the named plaintiffs' and the class members' claims, will defeat the Court's ability to achieve a considerable efficiency through collective adjudication of those claims." 141 F.R.D. 58, 65 (S.D. Ohio 1991). Here, the shared characteristics—the harm alleged, the legal claims, the damages sought, leases held with at least one defendant or operated by one defendant—as compared to the different characteristics—amended lease terms, type of relationship between the putative class and defendants, which Named Plaintiffs still have claims against the Defendants—do not defeat the Court's ability to adjudicate these claims efficiently.

All Named Plaintiffs still have claims against Rice and Gulfport. While only Passmore and the Schusters have claims against Ascent and XTO, Defendants have not demonstrated why Plaintiffs Schuster alone are ill-equipped to represent the claims of all absent class members against Ascent and XTO. The same cannot be said, however, for Passmore. Both parties acknowledge that Passmore receives royalties from XTO for drilling and production on Passmore's property. This Court recognizes Plaintiffs' joint tortfeasor liability theory as it relates to XTO and Ascent because of their role in operating, drilling, or profiting from the at-issue wellbores. Under the joint tortfeasor liability theory, however, Passmore may also qualify as a joint tortfeasor because it receives royalties from some of the leases on which XTO drills and

produces hydrocarbons. A class representative that also may be held liable for the very claims it brings against defendants risks a substantial conflict of interest and is an inadequate representative. *See e.g., Kornick v. Talley*, 86 F.R.D. 715 (N.D. Ga. 1980) (When the named plaintiffs allegedly had breached their fiduciary duties as trustees of a testamentary trust that held shares of defendant corporation, they were inadequate class representatives in a class action seeking to be maintained on behalf of the shareholders.); *Radell v. Towers Perrin*, 172 F.R.D. 317 (N.D. Ill. 1997) (Named plaintiff's conflict of interest with proposed class as former board member of defendant failed adequacy prong in ERISA action brought on behalf of profit-sharing plan participants against defendant for breach of fiduciary duty, when plaintiff was a board member when the decision to purchase that investment was made, so that he would be liable for damages for breach of fiduciary duty.).

Plaintiffs have alleged facts demonstrating that the interests of Schusters, Feiocks, and Butlers are aligned with some or all the absent class members and that they have selected counsel who will competently and vigorously pursue this litigation. Therefore, this Court finds that the adequacy prong of Rule 23(a) is met with respect to them, but not with respect to Passmore as a class representative for claims against XTO. *See* Fed. R. Civ. P. 23(d)(1) (giving the court authority to impose conditions on representative parties).

### D.     Class Certification – Rule 23(b)(3)

Because Plaintiffs seek to certify this class as an opt-out class action under Rule 23(b)(3), this Court must assess whether: (1) questions of law or fact common to members of the class predominate over questions affecting individual members; and if (2) the class action is a superior method to others for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3). Additionally, the class description must be "sufficiently definite so that it is administratively

feasible for the court to determine whether a particular individual is a member." *Cole*, 839 F.3d at 541 (quoting *Young*, 693 F.3d at 538). Despite Plaintiffs success on the Rule 23(a) factors, Plaintiff's claims fail to meet the Rule 23(b)(3) factors required to certify this class.

### 1. Predominance

#### a. Plaintiffs' Arguments

Plaintiffs maintain that two issues predominate in this litigation: (1) whether the class leases conveyed to the Defendants the rights to drill in the Point Pleasant Formation; and (2) whether Defendants, individually or as a joint venture, drilled and produced from the Point Pleasant Formation. (ECF No. 401 at 31–32). Plaintiffs argue that determination of the Class Lease interpretation question will resolve the litigation for all members of the putative class because contractual language at issue is identical across leases. (ECF Nos. 382 at 39; 401 at 56–57). Plaintiffs maintain that these questions predominate over individual inquiries about the alleged tort claims and what, if any, damages a putative class member sustained. (ECF No. 401 at 51). Further, Plaintiffs argue that the relief for trespass, conversion, and unjust enrichment are clearly defined under Ohio law. (ECF No. 382 at 40). This could include a measure of the value of minerals damaged and destroyed, and the value of converted property at the time of conversion minus costs for drilling and producing. (*Id.* at 41). These damages, Plaintiff maintains, are easily calculable by applying standard royalty calculation methodology based on Defendants' copious records of oil and gas obtained through drilling on Plaintiffs' property and the property of putative class members. (*Id.*; 401 at 31, 52). The fact that the class members may need to adduce individual damages, Plaintiffs argue, does not preclude a finding of predominance. (ECF No. 401 at 35; 52).

Finally, Plaintiffs maintain that the intent of the original lease negotiators is an inappropriate consideration at this stage as it goes to the merits. (ECF No. 401 at 18–20). Even if

this Court were to skip to the merits, Plaintiffs argue that Ohio law does not consider the intent of the plaintiffs in wrongful taking, conversion, trespass, and unjust enrichment actions because there is a legal presumption against the defendant where said defendant has interfered with a plaintiff's property interests regardless of the defendant's intent. (*Id.* at 21–22; 26).

### b. *Defendants' Arguments*

Defendants maintain that individualized questions of law predominate over any common question. (ECF No. 387 at 17; 30). Defendants offer several examples of individualized inquiry necessary to adjudicate this matter: (1) the intent of each putative class member in entering into the leases; (2) whether class members, like Passmore, have conflicts of interest because of existing interests in Defendants' production and revenue from the oil and gas; (3) whether Plaintiffs meet the threshold requirement for trespass of having possessory interests in the property covered by the leases; and (4) proving up, through chain of title, whether all plaintiffs meet the ownership requirement for conversion and unjust enrichment claims. (*Id.* at 17, 24, 30–33).

Further, Defendants allege that Plaintiffs have failed to provide methodology to prove each putative members' interests in the leases with common proof, which Defendants argue is a necessary step. (*Id.* at 31, 33). Even if this Court were to assume that each class member had a possessory interest in the property at issue, Defendants argue that Plaintiffs cannot establish via common proof that: (1) any given property was trespassed upon, converted, unjustly enriched from; (2) account for temporal differences in when Plaintiffs acquired or amended their leases; (3) determine the interests both Plaintiffs and Defendants had when oil and gas was extracted from the properties; (4) establish difference in well development and hydrocarbon production; (5) determine whether the oil and gas was actually extracted from the Point Pleasant Formation and not the permitted, Utica Shale; (6) establish the market value of oil and gas production due to

differing quality and production characteristics across leases; and (7) account for production difference amongst the wells covered by each lease. (*Id.* at 34–51).

The wells (vertical drillings), wellbores (horizontal drillings), and fractures (openings in the earth emanating from the horizontal wellbore through which the oil and gas flow to the wellbore) traverse multiple properties which contribute to production of oil and gas from Point Pleasant to varying degrees; therefore, Defendants argue that this Court must individually assess whether each leased property was physically trespassed upon or converted from. (*Id.* at 40–42). Because Defendants pay the lessors royalties based on the percentage of surface land each lessor owns in a designated pooling unit and not based on the amount of oil and gas extracted from the particular lessor's property, Defendants allege that certain lessors may have had no oil or gas withdrawn from their land, meaning they could not meet the possession requirements for the alleged torts. (*Id.* at 36, 42). Therefore, Defendants maintain that an individualized inquiry is required to determine each lessor's injury. (*Id.*).

Finally, Defendants argue that Plaintiffs' proposed, contractual, uniform allocation methodology for calculating damages is inapplicable to Plaintiffs' tort claims because Plaintiffs must separately establish the damages they suffered as a result of the alleged tort. (*Id.* at 53).

### c. *Court's Analysis & Findings*

The Sixth Circuit has noted that "[s]ubdivision (b)(3) parallels subdivision (a)(2) in that both require that common questions exist, but subdivision (b)(3) contains the more stringent requirement that common issues 'predominate' over individual issues." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1084 (6th Cir. 1996) (citation omitted). Many courts, recognizing the interplay between the requirements of 23(a) and (b), have reasoned that "a finding of commonality will likely satisfy a finding of predomination," and "issues are considered to predominate when there

36

is a 'common nucleus of operative fact' among all class members." *Mejdreck v. The Lockformer Co.*, No. 01-C-6107, 2002 WL 1838141, *6 (N.D. Ill. Aug.12, 2002). Rule 23(b)(3) does not require the common questions to be the only questions. *Eaton v. Ascent Res.-Utica LLC*, No. 2:19-cv-3412, 2021 WL 3398975, at *12–13 (S.D. Ohio Aug. 4, 2021). But "[t]o satisfy the predominance requirement in Rule 23(b)(3), a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof.'" *Bridging Communities Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1124–25 (6th Cir. 2016) (quoting *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir. 2007). A class "may obtain certification under Rule 23(b)(3) when liability questions common to the class predominate over damage questions unique to the class members." *Glaser v. Whirlpool Corp.*, 722 F.3d 838, 861 (6th Cir. 2013), *cert denied*, 134 S. Ct. 1277 (2014).

There are two main issues in this case that will require individualized inquiry: (1) intent of the contracting parties; and (2) establishing the individualized elements of the three tort claims alleged. First, under Ohio law, ""[c]ontracts are to be interpreted so as to carry out the intent of the parties, as that intent is evidenced by the contractual language." *Skivolocki v. E. Ohio Gas Co.*, 313 N.E.2d 374, 376 (Ohio 1974), ¶ 1 of syllabus. Words and phrases are given their common and ordinary meanings unless another definition is clearly evident in the contract itself or there would be manifest absurdity. *Shifrin v. Forest City Ent., Inc.*, 597 N.E.2d 499, 501 (Ohio 1992). Extrinsic evidence is likewise admissible when circumstances surrounding the agreement give the plain language special meaning to give effect to the parties' intent. *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996). Extrinsic evidence can include: "(1) the circumstances surrounding the parties at the time the contract was made, (2) the objectives the parties intended to accomplish

by entering into the contract, and (3) any acts by the parties that demonstrate the construction they gave to their agreement." *Lutz v. Chesapeake Appalachia, L.L.C.*, 148 Ohio St.3d 524, 2016-Ohio-7549, 71 N.E.3d 1010, ¶ 9 (Ohio 2016).

During oral argument, Plaintiffs cited to a recent decision by the Ohio Court of Appeals which addressed the meaning of the same Reservation Clause in different oil and gas leases held by Rice and Gulfport with Tera, LLC, a different plaintiff. In that decision, the Court upheld the trial court's ruling that the Reservation Clause language unambiguously reserved the right to drill into the Point Pleasant Formation to the lessors and the Utica Shale and Point Pleasant Formation were separate geological structures. *Tera, LLC v. Rice Drilling D, LLC*, 2023-Ohio-273, ¶¶ 46–48 (Ohio Ct. App. 7th Dist. 2023). While Plaintiffs suggest that this decision forecloses any need to consider the intent of the lessors in this matter, the Plaintiffs are mistaken.

Under Ohio law, issue preclusion is only applicable if: (1) the fact or issue was actually litigated in the prior action; (2) the court actually determined the fact or issue in question; (3) the party against whom issue preclusion is asserted was a party, or in privity with a party, to the prior action. *Osborn v. Knights of Columbus*, 401 F.Supp.2d 830, 832–33 (N.D. Ohio 2005). While the Full Faith and Credit Act, 28 U.S.C. § 1738, requires federal courts to give a prior state court adjudication the same preclusive effect that it would have under the law of the state whose court issued the judgment, that principle is inapplicable here. *Migra v. Warren City Sch. Bd. of Educ.*, 465 U.S. 75, 80–81 (1984). Ohio law requires mutuality of parties where a party seeks to use collateral estoppel offensively. *Chambers v. Ohio Dep't of Human Servs.*, 145 F.3d 793, 801 n. 14 (6th Cir. 1998). Here, Plaintiffs attempt to use the *Tera, LLC* decision on this specific issue against Defendants offensively by attempting to bar Gulfport and Rice from relitigating an issue previously decided against them in a different action. *Id.* For purposes of collateral estoppel, privity

is limited to a successor in interest to the party who controlled the earlier action. *U.S. v. Vasilakos*, 508 F.3d 401, 406 (6th Cir. 2007). Therefore, this issue is not settled as it applies to defendants in this action. This Court need not decide whether the individualized question related to intent predominate over the common question in this matter, however, because the individualized inquiries required for Plaintiffs' torts claims, alone, defeat the predominance requirement.

Named Plaintiffs and the putative class have claims against one or more of the Defendants under Ohio law for common law trespass, conversion, and unjust enrichment arising out of Defendants alleged unlawful intrusion into and production of oil and gas from the Point Pleasant Formation. (ECF No. 382 at 2). The elements of trespass under Ohio law are: "(1) an unauthorized intentional act, and (2) entry upon land in possession of another." *Brown v. Scioto Bty. Bd. of Commrs*, 622 N.E.2d 1153, 1161 (Ohio Ct. App. 4th Dist. 1993). To prove conversion, a plaintiff must demonstrate: (1) the plaintiff had ownership or right of possession of the property at the time of conversion; (2) the defendant's conversion by a wrongful act or disposition of plaintiff's property or property rights; and (3) damages resulted therefrom. *RAE Assocs., Inc. v. Nexus Communications, Inc.*, 36 N.E.3d 757, 765 (Ohio Ct. App. 10th Dist. 2015). Further, it "is fundamental that a plaintiff in a conversion action [ ] show title or rightful ownership of the chattel, including money, at the time of the alleged conversion." *Levens Corp. v. Aberth,* 9th Dist. No. 15661, 1993 WL 28574 (Feb. 10, 1993), citing Restatement of the Law 2d, Torts, Section 222(A), at 431 (1965), and *Fayette Invest. Corp. v. Jack Johnson Chevrolet Co.,* 119 Ohio App. 111, 197 N.E.2d 373 (Ohio Ct. App. 2d Dist. 1963). Finally, to prevail on an unjust enrichment theory, the plaintiff must establish three elements: "'(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant

under circumstances where it would be unjust to do so without payment.'" *Hambleton v. R.G. Barry Corp.,* 465 N.E.2d 1298, 1302 (Ohio 1984).

To meet the predominance element of Rule 23(b)(3), the common question need not be dispositive of the entire action. Wright & Miller, 7AA Fed. Prac. & Proc. Civ. § 1778 (3d ed.). As detailed *supra*, as long as one or more of the central issues predominate, the action may be considered proper under Rule 23, even though important matters such as damages and affirmative defenses peculiar to some individual class members will have to be tried separately. *Eaton*, 2021 WL 3398975, at *12–13. These situations, however, are mostly found in antitrust or securities-fraud cases where courts hold that the defendants' activities present a "common course of conduct" that establishes statutory liability common to the class. Wright & Miller, 7AA Fed. Prac. & Proc. Civ. § 1781 (3d ed.); *see* Fed. R. Civ. P. 23(c)(4)(A) (allowed a court to maintain a class action with respect to particular issues rather than the entire action).

Here, Defendants' liability ultimately turns on questions of common law, and while central to step one of the legal analyses, the contract interpretation question cannot be said to predominate over the individualized inquiries required to resolve the actual, alleged injury to Plaintiffs. *See generally Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213 (10th Cir. 2013) (Predominance of common issues was not established simply by virtue of the lessee's uniform methodology of payments to royalty owners of gas wells, in royalty owners' class action against the lessee for underpaying royalties in violation of the Kansas implied duty of marketability (IDM); rather, the district court was required to consider whether IDM existed in every lease, the effect of well-by-well variations on marketability, and the extent to which material differences in damages determinations would require individualized inquiries); *Cf. Sandusky Wellness Center, LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460 (6th Cir. 2017) (The question of class

40

member consent to receive fax advertisements from a pharmaceutical distributor presented an individualized issue that was central to the lawsuit and prevented common questions from predominating in a class action alleging violation of the Telephone Consumer Protection Act because the distributor could not be liable to any individuals who had solicited their fax advertisement, and weeding out the solicited from the unsolicited fax recipients would require manually cross-checking 450,000 potential consent forms).

A review of the elements of Plaintiffs' claims demonstrates that individual inquiries must be conducted for each member of the class as it relates to all three state law claims. Each claim requires the Plaintiffs to prove that Defendants took action specific to the property the Plaintiffs hold as lessors—whether Defendants entered the land, whether plaintiffs had possession of the property, or whether oil and gas was extracted from that specific property. Each of these state law claims require a location-specific inquiry, and necessarily a Plaintiff-specific inquiry. Plaintiffs attempt to distinguish these individual inquiries by classifying them as simple damage inquiries, which are not considered a bar to predominance under Rule 23. *Glaser v. Whirlpool Corp.*, 722 F.3d at 861. This is an inaccurate description, however, that misses half of the story. To establish the required elements of their claims, Plaintiffs must conduct these specific inquiries if they wish to hold the Defendants liable. Defendants cannot be held liable for trespass, conversion, nor unjust enrichment unless they acted in a way that impacted each class members' specific tracts of land.

This individualized inquiry is particularly important given the pooling unit structure in which the leases at issue are held. In a pooled drilling unit, the royalty benefits from any well are distributed across all landowners in the pool, even where a well on one property will only (or primarily) drain oil or gas from below that property, and not from the part of the common pool below the other property. *See Golden Eagle Resources II, LLC v. Rice Drilling D, LLC*, Case No.

41

2:22-cv-2374, ECF No. 22 at 13 (S.D. Ohio Feb. 10, 2023) (Marbley, J.). Plaintiffs cite a case from the Eastern District of Texas that found that in pooled units, courts have observed that a mineral owner "no longer owns a full interest in their respective individual tracts; rather, after pooling they own undivided interest in the entire pooled unit in the proportion that each owner's contribution bears to the pooled unit." *PYR Energy Crops. v. Samson Res. Co.*, 456 F. Supp. 2d 786, 796 (E.D. Tex. 2006). This Court is unable to identify a similar holding in Ohio nor were Plaintiffs able to provide one during oral argument. Further, this Court fails to find evidence that Ohio's oil and gas pooling laws usurp the individualized inquiries required to prove trespass, conversion, and unjust enrichment under Ohio's common law of torts. *See e.g.*, *Baatz v. Columbia Gas Transmission, LLC*, 929 F.3d 767, 773 (6th Cir. 2019) (citing *Chance v. BP Chemicals, Inc.*, 670 N.E.2d 985, 991–92 (Ohio 1996)) (Under Ohio law, subsurface ownership rights are limited, and "to survive summary judgment on [a] trespass claim (whether direct or indirect), Landowners must show that Columbia Gas interfered with the [reasonable or foreseeable] possessory interest in their subsurface.").

Plaintiffs' proposed approach goes against the weight of Ohio precedent which establishes that subsurface rights are limited in Ohio, and landowners must demonstrate interference with their possessory interest. *Chance*, 670 N.E.2d at 991–92. In fact, the Ohio statute Plaintiffs cite for their proposition that an individual lessor gains possessory interests in the entire pooled unit once joined, specifically reserves the original possessory interests in the property to each lessor: "[N]o order providing for unit operations shall be construed to result in a transfer of all or any part of the title of any person to the oil and gas rights in any tract in the unit area." OHIO REV. CODE § 1509.28(M). While Plaintiffs may have royalty rights related to the entire pooled units, those rights do not translate to possessory rights under current Ohio law. *See e.g., Golden Eagle Resources*, Case No.

2:22-cv-2374, ECF No. 22 at 13; 22 (finding that the proposition that trespass on a portion of a pooled unit results in trespass on all leases within that unit deficient as a matter of law). For all alleged tort claims, Plaintiffs must demonstrate Defendants improperly infringed upon a right or benefit held by Plaintiffs as related to their specific plot of land.

Even though answering the contract interpretation question drives resolution of a common issue, that is only step one of the required legal inquiries. The answer to this question, however, does not predominate over the necessary inquiries needed to get to the heart of the tort injury affecting individual class members. Of course, the district court would be free to revisit this issue at a later time if discovery shows that the number of leaseholders whose property was trespassed upon, converted from, and unjustly enriched from due to Defendants' actions is less significant than it now appears. *Young*, 693 F.3d at 544–45. Therefore, the predominance requirement of Rule 23(b)(3) is not met, and this class cannot be certified under its current structure.

### 2.  Superiority

#### a.  Parties' Arguments

Plaintiffs argue that the putative class's interest would only be harmed by individualized litigation, as a class action ensures a consistent ruling across the Plaintiffs and promotes judicial economy. (ECF Nos. 382 at 43; 401 at 57). Plaintiff explains that there are two other cases currently pending against the same Defendants regarding the same contract dispute, which supports certification so as not to expand the possibility of inconsistent verdicts. (ECF No. 382 at 44). Finally, Plaintiffs maintain that the Southern District of Ohio is a convenient forum for litigation given its proximity to the land at issue and the parties, and this Court is experienced in managing cases of this size. (*Id.*).

Defendants respond that superiority is lacking because absent class members have substantial incentive to file their own lawsuits, with potentially conflicting outcomes, and have already filed their own lawsuits which returned several million-dollar verdicts. (ECF No. 387 at 56–57).

### b. Court's Analysis & Findings

Courts should consider a number of factors when deciding whether a class action is the superior means of adjudication: "(1) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (2) the existence of pending litigation concerning the same controversy; (3) the desirability of concentrating the litigation of the claims in this forum; and (4) the difficulties likely to be encountered in the management of the class action." *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 757–58 (6th Cir. 2013).

Litigation "alleging a single course of wrongful conduct [is] particularly well-suited to class certification." *Powers v. Hamilton Cnty Pub. Def. Com'n*, 501 F.3d 592, 619 (6th Cir. 2007); *see also Sterling v. Velsicol Chemical Corp.,* 855 F.2d 1188, 1197 (6th Cir. 1998) (acknowledging an "increasingly insistent need" to certify class actions for lawsuits arising out of a "single course of conduct"). Where many individual inquiries are required, a class action is not a superior form of adjudication. *See Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Michigan,* 654 F.3d 618, 631 (6th Cir. 2011). "Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device." *Deposit Guar. Nat'l Bank v. Roper,* 445 U.S. 326, 339 (1980). However, where a threshold issue is common to all class members, class litigation is greatly preferred. *Daffin v. Ford Motor Co.,* 458 F.3d 549, 554 (6th Cir. 2006) ("Permitting individual owners and lessees of 1999 or 2000 Villagers to litigate

44

their cases is a vastly inferior method of adjudication when compared to determining threshold issues of contract interpretation that apply equally to the whole class.").

It is well-established in the Sixth Circuit, that where a threshold issue is common to all class members, class litigation is greatly preferred. *Daffin,* 458 F.3d at 554. The threshold question here is whether the class leases conveyed to the Defendants the right to drill in the Point Pleasant Formation. (ECF No. 401 at 31–32). The purpose of the class here is to litigate a key question: who has the rights to drill into the Point Pleasant Formation? Answering that question will help solve the alleged course of wrongful conduct across the putative class—that Defendants wrongfully drilled, produced, and profited from gas and oil extracted from the Point Pleasant formation. *Powers*, 501 F.3d at 619. Litigating this issue across the putative class in one litigation could resolve this contract interpretation question for more than 1,200 lessors.

That said, there is substantially related litigation currently pending in this district and in Ohio state courts, which undermines the efficiency offered by the proposed class action. First, in *TERA II* a different group of non-class action Plaintiffs—but who could be members of the putative class here—bring an identical set of claims against Rice, Gulfport, and Ascent, in addition to a breach of contract claim alleging unpaid royalties. *See TERA II v. Rice Drilling*, Case No. 2:19-cv-2221 (S.D. Ohio). That case is at the summary judgment stage and indicates to this Court that parties affected by the alleged wrongful action have an incentive to pursue individualized litigation. Second, the Seventh District Court of Appeals of Ohio recently upheld the trial court's ruling granting summary judgment in favor of Tera, LLC, a different plaintiff, for claims of willful trespass and conversion against Rice Drilling and Gulfport where the same Reservation Clause language was at issue. *Tera, LLC v. Rice Drilling D, LLC*, 2023-Ohio-273, ¶¶ 52, 58 (Ohio 7th Dist. Ct. App. 2023) (rehearing denied). While a portion of the compensatory damage award was

remanded for retrial and the matter has been appealed to the Ohio Supreme Court, the trial court initially returned a damage award of about $40 million, and Court of Appeals upheld TERA's right to compensatory and future damages. *Id.*, ¶ 134. Additionally, this type of award indicates that class members could be motivated to not only pursue litigation individually, but individual litigation would be feasible given the size of the potential awards and the presence of both individuals and entities in the putative class.

Viewing the totality of the circumstances, the balance of factors weighs against a class action as the superior vehicle through which to resolve the claims raised. While Plaintiffs have identified over 1,200 potential class members who could be members of this class, a number of those same potential plaintiffs have brought suit separately and have a strong interest in controlling and maintaining separate actions. *Compare Abby v. City of Detroit*, 218 F.R.D. 544, 549 (E.D. Mich. 2003) (finding superiority lacking where over 100 putative class members had already brought individualized suits against the City of Detroit for unconstitutional arrest policy) *with Lyon v. Caterpillar, Inc.*, 194 F.R.D. 206, 222 (E.D. Pa. 2000) (finding that in a proposed class action based on consumer fraud "[t]he fact that at least one putative class member resolved his claims against defendant weighs against certification."). The number of pending litigations concerning the same controversies as this action falls somewhere in between *Abby* and *Lyon*, but some of these pending actions have already reached the merits. Further, the several million-dollar award in *Tera, LLC* demonstrates to this Court that putative class members are already strongly incentivized to pursue individualized litigation strategies. Accordingly, this Court does not find the superiority requirement satisfied.

46

### 3. Ascertainability

#### a. Plaintiffs' Arguments

Plaintiffs argue that that the identity of each class member is known to the Defendants because they are either the original lessors of the property or their successors-in-interest, who receive monthly royalties from Defendants.[3] (ECF Nos. 382 at 17; 401 at 13). Further, Plaintiffs maintain that they had conducted extensive discovery from which they crafted the proposed class definition that provides the "who," "where," and "how" of each member of the class who entered into a Class Lease between late-2012 and early-2014. (ECF No. 382 at 21). Plaintiffs clarify that they specifically added the words "without agreement from the Lessor" to the class definition to exclude those from the class who subsequently conveyed their rights to the Point Pleasant formation to any or all of the defendants. (ECF No. 401 at 24).

Finally, Plaintiff argues that the proposed class definition is based on solely objective criteria, and not determinative of the ultimate issue of liability. (ECF No. 382 at 21). Citing Sixth Circuit precedent, Plaintiffs maintain that just because the proposed class definition might include those who are not ultimately entitled to relief, does not make the class a "fail-safe" class. (ECF No. 401 at 23). It is sufficient, they argue, for the class to be defined by objective criteria because further inquiry would require this Court to consider the merits of Plaintiffs' claims. (*Id.*).

#### b. Defendants' Arguments

Defendants allege that Plaintiffs have failed to establish ascertainability because: "(1) Plaintiffs' proposed class is an improper 'fail-safe' class; and (2) the individualized fact-finding

---

[3] Plaintiffs allege that Defendant "admittedly have records identifying any transfer or conveyance of the property or lease by the original lessor as they pay monthly royalties, and said transfer is reflected in a division of interest or other document." (ECF No. 401 at 13).

necessary to determine class membership is not administratively feasible." (ECF No. 389 at 5). First, Defendants explain that if this Court adjudges that the leases do not permit Defendants to produce hydrocarbons from the Point Pleasant rock formation, then the lessor is in the class and bound by the judgment. (*Id.* at 6). Conversely, Defendants argue that if the Court decides the Defendants can produce hydrocarbons from that formation, the lessor was never in the class and not bound by the judgment. (*Id.*). These types of classes, Defendants argue, are an independent ground for denying class certification. (*Id.* at 5 (citing *Randleman v. Fid. Nat. Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011)). Second, Defendants reiterate that Plaintiff's claims require a fact-intensive inquiry into the ownership of the Point Pleasant Formation underlying each lease, which raises the same issues with the Ohio Dormant Mineral Act and Marketable Title Act that are currently under review by the Ohio Supreme Court—namely whether ownership of below surface geological formations can be determined by examining record title for the surface property. (*Id.* at 8–10). Finally, Defendants argue that they do not know about every lease conveyance that has occurred within the applicable time period because, under Ohio law, it is the responsibility of the successor-lessors to provide reasonable notice of a change in ownership. (*Id.* at 9 (citing *Jacobs v. Dye Oil, LLC*, 2019-Ohio-4085, ¶ 56) (Ohio Ct. App. 7th Dist. 2019)).

### c.  *Court's Analysis & Findings*

It is well established that whether a class is ascertainable is a distinct inquiry from whether the class membership requires an individualized inquiry because "[a]scertainability requires only the existence of objective criteria upon which class membership is based." *McNamee v. Nationstar Mortg., LLC*, No. 2:14-cv-1948, 2018 WL 1557244, at *4 (S.D. Ohio, Mar. 30, 2018) (citing *Young*, 693 F.3d at 538–39). A previous ruling by this Court provides an instructive example:

> To illustrate the difference between ascertainability and susceptibility to individualized inquiry, consider, for example, a class defined as "all people in the State of Ohio who currently have a pint of mint chocolate chip ice cream in the freezer." Such a class is certainly ascertainable: every Ohioan either is a class member, or she is not. The inquiry is an objective one. But—at least to this Court's knowledge—there is no centralized list of Ohioan mint chocolate chip ice cream enthusiasts that would obviate the need for an individualized inquiry to compile the class.

*McNamee*, 2018 WL 1557244, at *4. Further, the Sixth Circuit counsels against denial of class certification simply because a time-consuming review of individual files is necessary. *Young*, 693 at 539. Defendants will have to conduct an individualized inquiry to ascertain who is a putative member of this class, but this inquiry is entirely within their control. The ODNR requires oil and gas companies to submit a Well Completion Report that includes the location of the well, its depth, and which geological formations are encountered during drilling. (ECF No. 382 at 20, n. 43). This means that Defendants are aware of the locations of their wellbores, the depths of their wells, and the pooled units from which they draw. Defendants also allege that certain leases have been amended specifically to allow drilling of the Point Pleasant Formation—demonstrating that Defendants track that information. Further, Defendants pay royalties regularly to the lessors from whose property oil, gas, and other hydrocarbons are extracted. Therefore, Defendants clearly can ascertain from which leases they drill from the Point Pleasant Formation, and a review of these leases will demonstrate whether the leases contain the at-issue Reservation Clause.

Despite the presence of some objective criteria, under this proposed definition however, Plaintiffs seek to certify an improper "fail-safe" class. A fail-safe class is one that cannot be defined until the case is resolved on its merits. *See Randleman v. Fidelity Nat'l Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011). "Such a class is prohibited because it would allow putative class members to seek a remedy but not be bound by an adverse judgment—either those 'class members win or,

by virtue of losing, they are not in the class' and are not bound." *Id.* (quoting *Randleman,* 646 F.3d at 352). As written, the proposed class requires this Court to determine whether the lessors "retained all rights to the formations . . . below the base of the Utica Shale formation," otherwise they are not in the class. (ECF No. 382 at 21). If the lessors did not retain this right, plaintiffs' claims cannot proceed. If the lessors did retain that right, Plaintiffs have established that Defendants, at a minimum, can be held liable for trespass, conversion, or unjust enrichment (though a decision of whether they should be held liable would come later).

A determination that a proposed class definition constitutes a "fail-safe" class on its own, however, is not a basis on which to strike plaintiffs' class allegations prior to the certification stage. *Sauter v. CVS Pharmacy, Inc.*, No. 2:13-CV-846, 2014 WL 1814076, at *6 (S.D. Ohio May 7, 2014) (citing *Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 814 (7th Cir.2012) ("[the fail-safe problem] can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis")). If ascertainability factor was the only issue with Plaintiffs' pleadings, this Court would typically provide Plaintiffs the opportunity to amend their proposed class definition. Because this class definition fails for other reasons, however, amendment is unnecessary. Plaintiffs' Motion for Class Certification (ECF No. 382) is **DENIED**.

### E. Declaratory Judgment

#### 1. Parties' Arguments

Defendants argue that Plaintiffs waived their right to certify their declaratory judgment claim by failing to move under Rule 23(b)(2), the necessary vehicle for certifying declaratory relief claims. (ECF No. 387 at 53). Plaintiffs respond that because they seek damages flowing from the anticipated ruling on the declaratory judgment claim, Plaintiffs are entitled to certification pursuant to Rule 23(b)(3). (ECF No. 401 at 69). Plaintiffs argue that while Rule 23(b)(2) certification may

be appropriate, a class established under that provision is mandatory, which raises potential due process concerns when dealing with claims that may entitle putative class members to monetary relief. (*Id.* at 70 (citing *Wal-Mart Store, Inc. v. Dukes*, 362, 398 (2011) (concluding that "[i]n the context of a class action predominately for money damages, we have held that the absence of notice and opt-out violates due process")).

### 2. Court's Analysis & Findings

The Supreme Court has provided some clarity where putative classes seek both injunctive or declaratory relief and damages. In *Wal-Mart Stores, Inc. v. Dukes*, the Court held that "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class . . . . [I]t does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." 564 U.S. at 360–61.

That said, neither the Supreme Court nor the Sixth Circuit have addressed directly whether parties seeking class certification for damages and declaratory relief must plead both Rule 23(b)(2) and (b)(3). Class actions for both can be certified under Rule 23(b)(2), but only where the monetary damages are incidental to the equitable remedy sought. Wright & Miller, 7AA Fed. Prac. & Proc. Civ. § 1784.1 (3d ed.). Generally, incidental damages are those that concomitantly flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief—meaning those to which class members automatically would be entitled once liability to the class as a whole is established. *See Allison v. Citgo Petroleum Corp.*, 151 F. 3d 402, 415 (5th Cir. 1998). Courts that have denied Rule 23(b)(2) certification of a hybrid class conclude that damage relief being sought either did not flow automatically to the class as a whole or was dependent on individual, not group proof. *See e.g., Gwiazdowski v. County of Chester*, 263 F.R.D. 178 (E.D. Pa. 2009) (denying certification of a proposed class in an action challenging the county

prison's search policies and seeking damages, declaratory judgment, and injunctive relief as it was not proper under Rule 23(b)(2) because determining whether to grant damages would require an individual showing of harm, not merely a finding that an unconstitutional policy existed, which would require subjective evaluations and additional hearings).

If it is determined that damage relief is not incidental, the Seventh Circuit suggests that the district court should consider three alternatives: (1) certifying the class under Rule 23(b)(3) for all proceedings; (2) certifying a Rule 23(b)(3) class for the portion of the case addressing damages and a Rule 23(b)(2) class for the portion of the case addressing equitable relief; or (3) certifying a class under Rule 23(b)(2) for both monetary and equitable remedies but exercise its plenary authority under Rule 23(d)(2) and 23(d)(5) to provide all class members with personal notice and opportunity to opt out. *Lemon v. Int'l Union of Operating Engineers, Local No. 139 AFL-CIO*, 216 F.3d 577, 581–82 (7th Cir. 2000).

The damages sought by Plaintiffs here are not incidental to the declaratory relief sought. Even if a jury concludes that Defendants did not have authority to drill into the Point Pleasant Formation, damages may not necessarily result for all members of the class as the claims for trespass, conversion, and unjust enrichment require analysis of both the Defendants' actions and Plaintiffs' possessory interest in the property. It is entirely possible that members of the putative class never had oil or gas drilled from their properties, especially given the pooling process. Therefore, this Court must take an alternative approach to certification under Rule 23(b)(2).

If this court had granted class certification, the most appropriate vehicle is by certifying all of the proceedings under Rule 23(b)(3). Even where plaintiffs seek hybrid relief, addressing the common question of whether Defendants took actions outside the scope of the leases is more efficient than individualized litigation. Additionally, certification under Rule 23(b)(3) entails

mandatory personal notice and opportunity to opt out for all class members, addressing any due process concerns. *See* Fed. R. Civ. P. 23(c)(2). Option two of certifying a portion of the case under Rule 23(b)(2) and another portion under Rule 23(b)(3) would require this Court to adjudicate the damages claims first before a jury to preserve the Seventh Amendment right to a jury trial. *See Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 479–80 (1962). Here, however, logic requires this Court first to resolve the question of whether Defendants are liable to Plaintiffs and goes to the declaratory relief sought. Option three, to certify under Rule 23(b)(2) and use Rule 23(d) to provide all class members with personal notice and opportunity to opt out, requires an extra step that is already built into Rule 23(b)(3) class certification.

Therefore, had plaintiffs met the Rule 23(b)(3) factors, certifying this class under Rule 23(b)(3) alone would have been the most efficient route, while ensuring a rigorous inquiry and due process protections for the putative class. Plaintiffs did not err in their pleadings and did not waive their right to seek declaratory relief.

## IV.    CONCLUSION

For the reasons stated above, this Court rules as follows: (1) Plaintiffs' Motion for Class Certification (ECF No. 382) is **DENIED**; (2) Plaintiffs' Motion to Strike John McBeath (ECF No. 396) is **DENIED**; (3) Plaintiffs' Motions to Strike the Declarations of Lucas Herren and Matt Reser (ECF Nos. 397; 408) are **DENIED**; (4) Plaintiffs' duplicative Motion to Strike the Declaration of Matt Reser (ECF No. 400) is **DENIED** as **MOOT**.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**UNITED STATES CHIEF DISTRICT JUDGE**

**DATE:  March 28, 2023**

53