**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **J&R PASSMORE, LLC** *et al.*, | : | |
| | : | |
| Plaintiffs, | : | **Case No. 2:18-cv-01587** |
| | : | |
| v. | : | **Chief Judge Algenon L. Marbley** |
| | : | |
| **RICE DRILLING D, LLC** *et al.*, | : | **Magistrate Judge Kimberly A. Jolson** |
| | : | |
| Defendants. | : | |

**OPINION & ORDER**

This matter is before this Court on four motions for summary judgment—Ascent and XTO's Motion for Summary Judgment (ECF No. 443); Defendants' Motion for Summary Judgment (ECF No. 444); Gulfport's Motion for Summary Judgment (ECF No. 445); and Plaintiffs' Motion for Summary Judgment (ECF No. 447)—and Plaintiffs' Motion to Stay or in the Alternative for Leave to File Supplemental Motion for Summary Judgment (ECF No. 477). For the reasons set forth *infra*, this Court orders as follows:

- **Threshold Matters.**

  - **Issue Preclusion as to Count I:** Plaintiffs' motion is **DENIED** on this issue as to all Defendants.

  - **Gulfport's Bankruptcy Settlement:** Summary judgment is appropriate on Plaintiffs' claims against Gulfport for damages that accrued before May 17, 2021, so Gulfport's motion is **GRANTED**.

  - **Passmore and XTO's Joint Operating Agreements:** XTO's request for summary judgment on joint operating agreement grounds is **DENIED**.

1

- o **Joint Venture Theory as to Ascent and XTO:** Consistent with the carve outs and clarifications in this Court's opinion, *infra* Section III.A(4), Ascent and XTO's motion for summary judgment on this issue is **GRANTED IN PART AND DENIED IN PART**.

- **Count I – Declaratory Judgment.** Summary judgment is:

  - o **DENIED** as to Plaintiffs; and

  - o **DENIED IN PART AND GRANTED IN PART** as to Defendants. It is **GRANTED** only as to the following four parcels based on the Schusters' November 12, 2021 lease language—14-00372.000; 14-00075.000; 26-03329.000; and 26-03298.000—and **DENIED** as to the rest.

- **Count II – Trespass.** Summary judgment is:

  - o **DENIED** as to Plaintiffs; and

  - o **GRANTED IN PART AND DENIED IN PART** as to Defendants. It is **GRANTED** only as to the following properties and **DENIED** as to the rest:

    - ▪ Tracts 2, 7, 13, and 44 of the Bennington Units;

    - ▪ Tract 22 of the Marcum East Unit;

    - ▪ Tract 14 of the Heller B Unit; and

    - ▪ Tracts 5 and 21 of the Heller A Unit.

- **Counts III & IV – Conversion & Unjust Enrichment.** Summary judgment is:

  - o **GRANTED IN PART** as to Defendants regarding the following properties:

    - ▪ Tracts 2, 7, 13, and 44 of the Bennington Units;

    - ▪ Tract 22 of the Marcum East Unit;

    - ▪ Tract 14 of the Heller B Unit; and

2

- ▪ Tracts 5 and 21 of the Heller A Unit.

    o **DENIED** as to all other issues.

- **Affirmative defenses.** Plaintiffs' Motion is **DENIED** as to all affirmative defenses.

- **Plaintiffs' Motion to Stay.** Plaintiffs' motion to stay is **GRANTED**.

## I.     BACKGROUND

### A.     Factual Background

Plaintiffs J&R Passmore, LLC ("Passmore"); Bruce and Jennifer Schuster; Brent and Doreen Butler; and Ryan and Cheryl Feiock (collectively, "Plaintiffs") own various pieces of property in Belmont County, Ohio, as well as the oil and gas rights to these properties. (ECF No. 38, ¶¶ 1–4). Defendant Rice Drilling D, LLC, ("Rice") entered into leases with Plaintiffs for the development of oil and gas minerals on Plaintiffs' properties. (*Id.*, ¶¶ 31–37).

Rice and Defendant Gulfport Energy Corporation ("Gulfport Energy") subsequently came to an agreement whereby they agreed to drill wells in Belmont County. (*Id.*, ¶ 46). Pursuant to this agreement, each drilled wells on Passmore's property, while Rice drilled additional wells on the Schusters', Butlers', and Feiocks' properties. (*Id.*, ¶¶ 49–50, 62, 71, 80). Rice and Gulfport Energy shared in the revenue produced from the sale of oil, gas, and other hydrocarbons from the wells on each of these properties. (*Id.*, ¶¶ 54–58, 65–66, 74–75, 82–83). Rice also assigned certain interests it had in its lease with Passmore and in certain leases with other then-putative class members to Defendant Gulfport Appalachia, LLC ("Gulfport Appalachia"). (ECF No. 262 at 1).

XTO Energy Inc. ("XTO") and Ascent Resources–Utica, LLC ("Ascent") agreed to share the burden of the funding, exploration, and development of their jointly owned interests in Belmont County. (ECF No. 38, ¶ 92). XTO and Ascent also have agreements with Rice to allow XTO and Ascent to drill wells on the Passmore and Schuster properties. (*Id.*, ¶ 93). Pursuant to these

3

agreements, XTO drilled wells on the Passmore and Schuster properties. (*Id.*, ¶¶ 96, 107). XTO and Ascent share in the revenue produced from the sale of oil, gas, and other hydrocarbons produced from the wells on these properties. (*Id.*, ¶¶ 97, 100–05, 108, 111–14). Additionally, XTO has acquired interests in four leases containing the contract language at-issue in this matter. (ECF No. 391 at 3).

While the parties and their respective experts agree that the Marcellus Shale, Utica Shale, and Point Pleasant are separate geological formations, the parties disagree on what the relevant contract language within the leases intended to convey to Defendants versus reserve to Plaintiffs. Plaintiffs allege that Defendants have infringed on Plaintiffs' mineral rights by drilling on and producing from property that they are not entitled to drill—specifically, the Point Pleasant— outside of the terms of their leases. (ECF No. 38, ¶¶ 51–52, 63–64, 72–73, 80–81, 98–99, 109– 10). Defendants allege that at the time of the contract negotiations, the Point Pleasant formation was understood to be part of the Utica Shale, and therefore, the language in the leases allows them to drill into the Point Pleasant formation.

## B.  Procedural Background

Plaintiffs filed this action on December 6, 2018 (ECF No. 1), and subsequently filed an amended Complaint a few months later. (ECF No. 38). The Defendants then filed a series of Motions to Dismiss (ECF Nos. 47–49), in response to which this Court: (1) denied Rice's Motion to Dismiss; (2) granted Ascent and XTO's Motions to Dismiss as to the Butlers and Feiocks; (3) denied Ascent and XTO's Motions to Dismiss as to Passmore and the Schusters; and (4) dismissed the Butlers' and Feiocks' claims against Ascent and XTO. (ECF No. 82 at 15). In July 2021, Plaintiffs filed and were granted an unopposed Motion to add Gulfport Appalachia, LLC as a defendant, because Gulfport Appalachia was assigned some of Rice's interests in the leases and in

4

light of Gulfport Energy's recent bankruptcy proceedings (together, "Gulfport"). (ECF No. 262 at 1; ECF No. 264).

Plaintiffs requested to proceed with their claims as a class action, but this Court denied class certification after oral argument. (ECF Nos. 382, 430, 437). This Court subsequently received four motions for summary judgment: one from Ascent and XTO (ECF No. 443), one from all the Defendants (ECF No. 444, 471), one from Gulfport (ECF No. 445), and one from the Plaintiffs (ECF No. 447). Plaintiffs filed an omnibus opposition to all three cross-motions (ECF No. 451), and Defendants opposed Plaintiffs' motion (ECF Nos. 450, 452, 453). Plaintiffs also sought leave to amend, and thereafter amended, their complaint to clarify the properties at issue. (ECF Nos. 458, 465, 466). This Court held oral argument on all four summary judgment motions (ECF No. 480), which are now ripe for review. Additionally, prior to this Court's oral argument on the summary judgment motions, Plaintiffs sought to stay this case in light of Gulfport's filing of a motion for contempt in the United States Bankruptcy Court for the Southern District of Texas ("Bankruptcy Court") (ECF No. 477), which Gulfport agrees is the best course of action (ECF No. 479). This motion is now also ripe for review.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Maben v. Thelen*, 887 F.3d 252, 258 (6th Cir. 2018). The court's function at the summary judgment stage is "not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The court thus asks "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of

law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). Ultimately, "summary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. That is, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 250. Evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment. *Id.* at 249–50

The party seeking summary judgment carries the initial burden of presenting the court with law and argument in support of its motion, as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial burden is satisfied, then the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Anderson*, 477 U.S. at 250.

Importantly, at the summary judgment stage, the court must "view[] factual evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in that party's favor." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). Accordingly, at this stage in the litigation, the court must accept the non-moving party's version of events without weighing the evidence or assessing the credibility of prospective witnesses. *Cordell v. McKinney*, 759 F.3d 573, 578 (6th Cir. 2014). But, "[t]he mere existence of a scintilla of evidence to support [the non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252).

6

### III.     LAW & ANALYSIS

### A.     Threshold Matters

#### *1. Issue Preclusion*

Unsurprisingly, Plaintiffs seek to preclude Defendants from asserting that: (1) the leases conveyed Plaintiffs' rights to the Point Pleasant to Defendants; and (2) any trespass was innocent. In arguing as much, they allege that an Ohio state court decision "addressed the precise issue set forth in Count I; namely, did Rice and Gulfport have the rights to drill and produce the Point Pleasant Formation?" (ECF No. 447 at 40 (discussing *Tera, LLC v. Rice Drilling D, LLC*, 2023-Ohio-273, P51, 205 N.E.3d 1168, 1184 (7th Dist. 2023))). In response, Defendants point to this Court's prior decision in the *TERA II* litigation to assert that "Ohio law does not permit non-mutual offensive issue preclusion—the theory upon which Plaintiffs rely—in this case." (ECF No. 450 at 2 (citing *TERA II, LLC v. Rice Drilling D, LLC*, No. 2:19-cv-02221, 2023 WL 4236670, at *6 (S.D. Ohio June 28, 2023))).

While Defendants are partially correct inasmuch as "Ohio courts generally require mutuality of parties to apply collateral estoppel," this Court recently elaborated on the limited exceptions where non-mutual offensive collateral estoppel is permitted—"where the defendant 'clearly had his day in court on the specific issue brought into litigation within the later proceeding, [then] the non-party plaintiff [can] rely upon the doctrine of collateral estoppel to preclude the relitigation of that specific issue.'" *TERA II*, 2023 WL 4236670, at *5 (quoting *In re: E.I. Dupont de Nemours and Co. C-8 Personal Injury Litig.*, 54 F.4th 912, 922 (6th Cir. 2022)). The relationship between the *Passmore* litigation and the *TERA, LLC* state litigation mirrors that of the relationship between the *TERA II* litigation and the *TERA, LLC* state litigation and, as was the case in *TERA II*, "[h]ere, Plaintiffs attempt to stop Defendants from relitigating the issues which

7

defendants previously litigated and lost against another plaintiff." *Id.* at *6. Considering this Court did not find an exception to the general mutuality-of-parties requirement to be warranted in *TERA II* where the parties were even more similar, "the application of non-mutual offensive collateral estoppel would be unfair to Defendants" as to different plaintiffs. *Id.* at *6. As such, this Court **DENIES** Plaintiffs' request for summary judgment on preclusion.

### 2. *Gulfport's Bankruptcy Settlement (ECF No. 445)*

While Gulfport joined and incorporated the broader motion for summary judgment on behalf of all Defendants (ECF No. 444), Gulfport separately moved for partial summary judgment "on all claims for damages that accrued before May 17, 2021" based on Gulfport's interpretation of the parties' settlement agreement. (ECF No. 445 at 1).

The settlement agreement in question splits Plaintiffs' claims against Gulfport into two categories: settled claims and reserved claims. (ECF No. 445-3 at PageID 43305). Settled claims pre-date Gulfport's bankruptcy "emergence date"—May 17, 2021—while reserved claims are those that accrued on or after this date, regardless of whether such claims had already been asserted. (*Id.*).

Plaintiffs agree that any of their claims—be it declaratory judgment, trespass, conversion, or unjust enrichment—for Gulfport's actions prior to May 17, 2021, have been settled, such that "Gulfport has no liability for those claims prior to that time" and owes no damages for that period of time. (ECF No. 451 at 56). Where Plaintiffs appear to disagree is regarding whether "Plaintiffs release all claims they asserted … against Gulfport before May 17, 2021," as Plaintiffs maintain that claims they previously asserted against Gulfport extend past May 17, 2021, and those claims are still live. (*Id.*). This Court interprets Plaintiffs' argument as emphasizing that the temporal

element relevant to the settled versus reserved divide hinges on the time of the conduct or at issue in a given claim, not when Plaintiffs brought that claim.

This Court agrees, and finds there to be a clear overlap of the parties' perspectives on the impact of the settlement agreement: Plaintiffs' claims for damages that accrued before May 17, 2021, were "settled" by the post-bankruptcy settlement agreement, but Plaintiffs' claims for damages that accrued (and conduct that occurred) on or after May 17, 2021, were "reserved" in the settlement agreement, even if the foundation of such claims was asserted prior to this date. This understanding is in line with this Court's prior articulations of the impact of this same settlement agreement. (*See TERA II*, No. 2:19-cv-02221, Jury Instructions, ECF No. 687 at 36, 44, 45). Summary judgment is therefore appropriate on Plaintiffs' claims against Gulfport for damages that accrued before May 17, 2021, so Gulfport's motion is **GRANTED**. But out of an abundance of caution, this Court emphasizes that Plaintiffs are correct that their claims for damages against Gulfport accruing after May 17, 2021 are fair game for this Court and a potential jury to consider, particularly in light of Gulfport's admission of production after this date. (*See* ECF No. 477 at 7).

### 3. *Passmore and XTO's Joint Operating Agreements*

XTO claims that even if the Passmore leases do not permit production from the Point Pleasant, XTO nonetheless "had the right to drill through and produce from the Point Pleasant beneath the Passmore tracts in the Heller A and Heller B Units" pursuant to Passmore and XTO's joint operating agreements ("JOAs"). (ECF No. 443 at 5). In XTO's view, if the Passmore leases did not grant the right to drill the Point Pleasant, then the Point Pleasant beneath Heller A and B is an "unleased … mineral interest[]" that is therefore subject to the depth-restriction-free JOA lease, under which XTO can develop that land.

9

In response, Plaintiffs assert that the JOAs do not solve XTO's problem, as they "encumber[] parcels of land not at issue in this lawsuit[.]" (ECF No. 451 at 52). In support of this, Plaintiffs explain that "the leases and interests subject to the JOA are identified on Ex. 'A'" which, in Passmore's view, shows that the JOAs "appl[y] solely to Passmore's unleased interest in Parcels 35-00196.000, 35-00196.001, 36-00134.000, and 35-90010.000 – NOT to Parcels 35-00172.000, 36-00134.000 and 35-00175.000."[1] (*Id.* at 53). To make their point, Plaintiffs give an example of how Passmore's working interest in the Heller B Unit was calculated and explain that this calculation would be incorrect under Defendants' theory. Plaintiffs also show that Exhibit A to the Heller B Unit JOA refers to relevant tracts as being part of an "Oil and gas Lease[] Subject to Agreement" such that, in their view, this land cannot be understood to be "unleased" as Defendants argue.[2] (*Id.* (citing ECF No. 493-14 at 41422–23)).

Based on the parties' briefing, this Court understands the lay of the land as to this argument to be as follows:

---

[1] The Court notes that Plaintiffs included parcel number 36-00134.000 in both categories, and this Court understands this parcel number to cover tracts in different units, but this Court understands Plaintiffs to be asserting that the entire parcel is unleased.

[2] In making this argument, Plaintiffs state that "Ex. A reflects that Parcels 35-00172.000, 35-00173.000 and 35-00175.000 were contributed leases by XTO" but then connect the tracts listed in Exhibit A (Tracts 13, 14, and 15, of Heller B) to "Parcels 35-00172.000, 36-00134.000 and 35-00175.000." But other information connects Tract 14 of Heller B to 35-00173.000, not 36-00134.000. (*See* ECF No. 454 at 2). As this other information aligns with this Court's understanding, this Court therefore interprets Plaintiffs' reference to 36-00134.000 as it relates to Heller B Tract 14 to be a clerical error.

10

| Unit | Parcel Owner | Parcel Number | Tract Number | Wellbore? | XTO argues subject to JOA lease? |
|------|--------------|---------------|--------------|-----------|----------------------------------|
| Bennington Unit B | Passmore | 36-00133.000 | 7 | No | No |
| | | 36-00460.000 | 13 | No | No |
| | | 36-00134.000 | 2 | No | No |
| | Schusters | 14-00252.000 | 44 | No | No |
| Heller Unit A | Passmore | 35-00172.000 | 21 | No | Yes |
| | | 36-00134.000 | 27 | Yes | Yes |
| | | 35-00175.000 | 5 | No | Yes |
| Heller Unit B | Passmore | 35-00172.000 | 13 | Yes | Yes |
| | | 35-00173.000 | 14 | No | Yes |
| | | 35-00175.000 | 15 | Yes | Yes |

Oral argument on this issue was instructive, as there is not a lot of on point case law in Ohio. Based on the evidence, the arguments of counsel, and viewing the evidence in the light most favorable to the nonmovant—which, on this issue, is Plaintiffs—the JOAs function as follows. The "contract area" of the JOAs defines the parties' "contributions" to the JOA, which are then subject to the accompanying JOA lease. Before the JOAs, Passmore had some properties that were already leased with Rice and some that were not. After reaching an impasse on an agreement about the properties not yet leased to Rice, conversations shifted to the potential of forced unitization. As a way to avoid this, Passmore contributed some of these unleased properties to the JOAs. XTO also contributed some properties to the JOAs. So, this Court understands that the JOAs cover these specifically dedicated plots of land—land that is not otherwise subject to a lease with Rice. Based on this understanding and without a clear explanation contradicting this, this Court cannot then make sense of the argument that any unleased interest—such as for the Point Pleasant, if the Smith-Goshen leases are not found to have granted that interest—is somehow subsumed into the JOA and its related lease. As such, summary judgment on JOA grounds is **DENIED**.

11

### 4. Joint Venture Theory for Ascent and XTO

In their summary judgment motion, Ascent and XTO claim that Plaintiffs failed to plead joint venture and that, regardless, they hold no leases and operated no units or wells subject to the Passmore or Schuster leases. (ECF No. 443 at 2). To the contrary, Plaintiffs assert that Ascent and XTO may be jointly and severally liable for all of Plaintiffs' potential damages pursuant to Ohio Revised Code § 2307.22(A)(1), which Plaintiffs allege requires any party with more than a 50% working interest in a pooled unit to be held jointly and severally liable in tort for all damages relating to that pooled unit. (ECF No. 451 at 51–52).

Whether a joint venture exists is a question of fact, guided by the five *O'Toole* factors: 1) existence of a joint contract; 2) Defendants' intent to form a joint venture; 3) a "community of interest and control, including contributions to the joint venture"; 4) Defendants' "mutual right to direct and control the purpose of the joint venture"; and 5) Defendants' agreement to share in the profits and the losses. *Anchor v. O'Toole*, 94 F.3d 1014, 1024 (6th Cir. 1996); *Bennett v. Sinclair Ref. Co.*, 57 N.E.2d 776, 782 (Ohio 1944). Ohio law is clear that each party who has entered into a joint venture agreement is "liable for the negligent and tortious acts of the other members, pursuant to the venture, that result in injury to third persons." *Hulett v. Am.'s Finest Serv. Co.*, No. 1:03-cv-2497, 2005 WL 2233261, at *12 (N.D. Ohio Sept. 14, 2005); Ohio Rev. Code § 2307.22(A)(1).

This Court first addressed the issue of joint liability at the motion to dismiss stage of this litigation in regard to Ascent, in which this Court explained that "Plaintiffs have pleaded sufficient facts to allege a plausible claim of a joint venture and that Defendants may therefore be liable for the negligent and tortious acts of their co-adventurers." (ECF No. 82 at 13). Put differently, where a Plaintiff has alleged that one Defendant physically trespassed onto its property, "it is immaterial

12

whether [another Defendant] physically trespassed"—that other Defendant can be liable vis-à-vis a joint venture. (ECF No. 82 at 5). But a joint venture only covers so much, and this Court determined that "XTO and Ascent cannot be liable for any of Rice's drilling activities on the Butler and Feiock properties," thereby dismissing those claims against Ascent and XTO. (*Id.* at 6).

Before laying out the analysis as to Passmore and the Schusters, a few things are worthy of mention. First, this Court does not read the Ohio joint and several tort liability statute quite the same as Plaintiffs do, so this Court refrains from holding that a 50% working interest automatically equals 50% liability. (*See* ECF No. 451 at 50–52). Second, when this Court reviewed joint and several liability at the summary judgment stage in the related *TERA II* litigation, XTO had been dismissed, hence the lack of discussion about XTO's potential liability there. *TERA II*, 2023 WL 4236670, at *6. Also, Plaintiffs properly pled the existence of a joint venture in their operative complaint. (ECF No. 38 at 18). Lastly, XTO and Passmore's joint operating agreements regarding the Heller A and Heller B Units come back into play here. *Supra* Section III.A(3).

As to the relevant facts, Defendants have drilled wells into and extracted oil and gas from the Point Pleasant via fourteen different pooled units that include Plaintiffs' property. (ECF No. 446 at 3–12). While different individual Defendants have drilled into or hold varying interests in the pooled units, as this Court has explained, "Rice and Gulfport have an agreement to drill wells … ; in turn, Rice has business agreements with XTO and Ascent; and XTO and Ascent have a business agreement with each other." (ECF No. 82 at 6; ECF No. 447-21). Therefore, regardless of whether XTO or Ascent has or could have physically trespassed upon the Passmore or Schuster land, they could be found liable by nature of a joint venture if Plaintiffs allege sufficient facts as to that Defendant's connection to the underlying unit.

13

A review of Plaintiffs' documentation of the Defendants' respective working interests in pooled units still at issue reveals that XTO held more than a 50% working interest in each pooled unit other than the Heller B Unit. (*See generally* ECF No. 447-16; ECF No. 447 at 3–12). Based on this, XTO could be held jointly and severally liable for these units as a result of a potential joint venture, so XTO's request for summary judgment as to its involvement in a joint venture regarding these units is **DENIED**. *See TERA II*, 2023 WL 4236670, at *8.

As to Ascent, it is true that Ascent was not assigned XTO's rights, titles, and interests in the units at issue here until July 1, 2022. (ECF No. 443 at 4; ECF No. 447 at 4–12). But Ascent held a working interest, albeit a smaller one than XTO, in some of the Passmore and Schuster property before then—specifically, the Bennington B Unit, the Heller A Unit, the Heller B Unit, and the Kemper Unit. (ECF No. 447 at 4; ECF No. 447-21 (Ascent's admission of these interests); *see, e.g.*, ECF No. 447-16 at PageID 44655–56, 44665–66); *see TERA II*, 2023 WL 4236670, at *7 (finding no plausible joint venture where the relevant defendants "either never held leases or did not have a working interest in these units, or they assigned those interests to the other Defendants prior to the completion of the drilling of the wells"). And as distinct from *TERA II*, Ascent's working interest in Heller A and B nullifies any argument that Ascent could not be held liable as a result of not being part of the joint operating agreements. As such, prior to its assignment of XTO's rights in July 2022, Ascent could be held jointly and severally liable for the other Defendants' conduct as to the Bennington B Unit, the Heller A Unit, the Heller B Unit, and the Kemper Unit if a joint venture is found.

So, this Court must assess if there exists a genuine dispute of material fact regarding whether (1) XTO operated a joint venture as to the Heller B Unit, and (2) Ascent operated a joint venture as to the Bennington B Unit, the Heller A Unit, the Heller B Unit, and the Kemper Unit.

14

As to XTO and Heller B, between XTO's working interest in Heller B (ECF No. 447-16 at 36) and the joint operating agreement that provides for pooling and unitization rights (ECF No. 443-14), there exists no genuine dispute of material facts that XTO was involved in a joint venture, so XTO's motion for summary judgment as to a joint venture with Heller B is **DENIED**. See *Cosic v. Kronberg*, 2012-Ohio-5982, ¶ 18, 984 N.E.2d 414 (Ohio Ct. App. 2012) (finding a joint venture where there was joint profit resulting from combined business efforts).

Also, neither parties' arguments and supporting records allow this Court to determine one way or the other whether Ascent operated a joint venture as to the Bennington B Unit, the Heller A Unit, the Heller B Unit, and the Kemper Unit, so Ascent's request for summary judgment on its involvement in a joint venture as to these units is **DENIED**.

To be clear, the Court reiterates that both XTO and Ascent can only be held liable under a joint theory of liability for the periods in which they held an ownership or working interest in the pooled units. The above analysis of XTO's potential liability applies to XTO prior to its assignment of its rights and interests to Ascent in July 2022. Before this assignment, Ascent only had a working interest in the Bennington B Unit, the Heller A Unit, the Heller B Unit, and the Kemper Unit, so Ascent can only be found to have engaged in a joint venture as to these units. But after XTO's assignment, Ascent assumes the same level of liability as XTO had which, as analyzed above, may provide for joint and several liability as to all of the units. After this assignment, XTO "no longer operates nor holds an interest in the Bennington Unit B, Heller Unit A, Heller Unit B, or Kemper A Unit," so XTO cannot be held jointly and severally liable as to these units after July 2022. (ECF No. 443-1). Summary judgment is therefore **GRANTED** as to XTO after the July 2022 reassignment of rights.

### B.      Count I: Declaratory Judgment

The parties submitted cross-motions for summary judgment on Plaintiffs' request for a declaratory judgment. Plaintiffs' request seeks three things:

> (1) Plaintiffs … specifically reserved in the subject leases the right to all products contained in any formation below the base of the Utica Shale, including, but not limited to the Point Pleasant formation,
>
> (2) the Point Pleasant formation is a separate and distinct formation from the Utica Shale, and lies below the base of the Utica Shale formation; and
>
> (3) Rice, Gulfport, XTO and Ascent do not have the right under the subject leases to produce oil, natural gas, or other hydrocarbon products from any formation below the Utica Shale including, but not limited to, the Point Pleasant formation.

(ECF No. 38 at 29). Defendants argue that this Court should grant summary judgment in their favor because the terms of the leases grant Defendants the authority to drill into the Point Pleasant. (ECF No. 444 at 18). But before getting to the substance, Defendants have two threshold concerns: that (1) Plaintiffs seek state law relief that the federal court is unable to provide, and (2) the Court should decline jurisdiction over the request for relief.

#### 1.   Relief Sought by and Jurisdiction Over Declaratory Judgment

As a federal court sitting in diversity to adjudicate state law claims, the federal Declaratory Judgment Act—a procedural law—controls requests for declaratory relief. *Skelly Oil Corp. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950). In this way, Defendants are correct that Plaintiffs are necessarily seeking a declaratory judgment from this Court under federal law, and Plaintiffs' citations to state declaratory judgment law on this matter are irrelevant. But Plaintiffs need not say some magic word to trigger this Court's review; Plaintiffs request a declaratory judgment in federal court, and such requests are addressed under the Declaratory Judgment Act. *See* 28 U.S.C. § 2201(a) (requiring only "an appropriate pleading").

So this Court considers whether an exercise of its discretionary jurisdiction is appropriate based on the five "*Grand Trunk* factors":

> (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory action remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for res judicata;" (4) whether the use of the declaratory action would increase friction between our federal and state courts and improperly encroach on state jurisdiction; and (5) whether there is an alternative remedy which is more effective.

*Travelers Indem. Co. v. Bowling Green Pro. Assoc., PLC*, 495 F.3d 266, 271 (6th Cir. 2007) (quoting *Grand Trunk W. R.R. Co. v. Consol. Rail Co.*, 746 F.2d 323, 326 (6th Cir. 1984)).

Factors one and two weigh in favor of jurisdiction. While a declaratory judgment would not resolve the entire controversy, "resolution of Plaintiffs' declaratory judgment claim would settle the threshold, and crucial, matter of whether Defendants acted outside the bounds of the lease." *TERA II*, 2023 WL 4236670, at *12. Either outcome clarifies the parties' legal relationship, mitigating the risk of future litigation. *Id.* (citing *In re Murray Energy Holdings Co.*, 637 B.R. 820, 824 (Bankr. S.D. Ohio 2022); *J.M. Smucker Co. v. Promotion in Motion, Inc.*, 420 F. Supp. 3d 646, 663 (N.D. Ohio 2019)). Factors three and four are neutral, as neither party provides evidence one way or the other. And as to factor five, this Court must resolve the question Plaintiffs seek an answer to in this request in order to grant any remedy for either party, which nullifies any argument of judicial-resource-saving by not considering Plaintiffs' request. *Id.* at *13 (citing *Adrian Energy Assocs. v. Michigan Pub. Serv. Comm'n*, 481 F.3d 414, 422–23 (6th Cir. 2007)).

This Court is sensitive to the fact that *Passmore* and *TERA II* are distinct cases brought by distinct plaintiffs, and makes clear where these cases differ throughout this opinion. But this jurisdictional hurdle is not one of those places, as the cases are effectively on all fours as to the Defendants' arguments against exercising jurisdiction under the Declaratory Judgment Act. This

Court's view of the matter has not changed since this Court addressed these same declaratory judgment arguments in *TERA II*, and Defendants cite no compelling reason this should come out differently from that analysis. As such, as the *Grand Trunk* factors weigh in favor of exercising jurisdiction over this declaratory judgment request as well, Defendants' motion as it pertains to this issue is **DENIED**.

### 2.   *Summary Judgment as to Declaratory Judgment*

As authority or lack thereof is relevant to all of Plaintiffs' claims, the answer to the question posed in order to evaluate this request for a declaratory judgment—whether there is a genuine dispute of material fact regarding the proper interpretation of the parties' lease language—applies beyond a declaratory judgment. Bear in mind that this is not this Court's first rodeo in tackling such a question, as this Court was confronted with the same question as applied to slightly different factual circumstances in *TERA II*. There, this Court was understandably presented with similar arguments from both parties as to the appropriate contract interpretation. *See TERA II*, 2023 WL 4236670, at *13–15.

And as noted there, this Court is still without guidance from the Ohio Supreme Court on the at-issue contract language, so this Court must once again predict how the court would rule. *Allstate Ins. Co. v. Thrifty Rent-A-Car Systems, Inc.*, 249 F.3d 450, 453–54 (6th Cir. 2001). This Court therefore proceeds according to the road map laid out in *TERA II*.

In Ohio, oil and gas leases are "contract[s] subject to traditional rules of interpretation and construction." *Shanesville Investments LLC v. Eclipse Resources I, LP*, 358 F. Supp. 3d 665, 669–70 (S.D. Ohio 2018). As such, summary judgment is inappropriate where there exists a "genuine issue of material fact regarding ambiguous terms in the contract." *Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 422 (6th Cir. 2008). In determining if the contract

18

language is ambiguous, the court asks whether such language is susceptible to two reasonable interpretations. *Schachner v. Blue Cross & Blue Shield of Ohio*, 77 F.3d 889, 893 (6th Cir. 1996). Only if the court finds the provision to be ambiguous based on the face of the contract does the court then move on to "use traditional methods of contract interpretation to resolve the ambiguity, including drawing inferences and presumptions and introducing extrinsic evidence." *Id.* The ambiguity decision is a question of law for the court, while the meaning of the ambiguous language is a question of fact for the jury. *Ohio Hist. Soc'y v. Gen. Maint. & Eng'g Co.*, 65 Ohio App. 3d 139, 146, 583 N.E.2d 340, 344 (Ohio 1989).

Thus, this Court must first decide if the lease language is ambiguous as to whether Plaintiffs granted or reserved the rights to the Point Pleasant. This Court's analysis of this question is bifurcated, as one of the Schusters' leases—the November 12, 2012 lease—is different from all the others (the "Smith-Goshen leases"). And again, "[u]nfortunately, the leases do not define independently the phrase and the parties disagree on its meaning." *TERA II*, 2023 WL 4236670, at *15. As to the legal landscape to guide this Court's analysis of this question, not much has changed since the *TERA II* discussion, as this Court still "lacks a wealth of Ohio caselaw on which it can rely." *TERA II*, 2023 WL 4236670, at *16. But one important thing differs here as compared to *TERA II*: the grant clauses of the at-issue leases. In the *TERA II* leases, the grant clause provides Defendants the right to drill "in the formations commonly known as the Marcellus Shale and the Utica Shale." *Id.* at *2 (quoting *TERA II*, No. 2:19-cv-02221, ECF No. 302; ¶ 50). But here, as to the Smith-Goshen leases, the text provides no such grant. Instead, Plaintiffs granted the lessee the rights to explore, drill, operate, produce and gather oil, gas and other hydrocarbons "*other than as reserved unto Lessor below*." (ECF No. 447-1 at 22) (emphasis added). As a result, the rub between the *Passmore* parties' views is not about whether the subsurface territory "commonly known as

19

the Utica Shale" was understood to include the Point Pleasant, as the Plaintiffs' grant clause here is not defined in that way. Rather, the Smith-Goshen grant clause directs us to the reservation clause, which is broken into three separate subsets of rights reserved to Plaintiffs:

> (1) from the surface of the leased Premises to the top of the formation commonly known as the Marcellus Shale, (2) in any and all formations below the base of the Marcellus Shale to the top of the formation commonly known as the Utica Shale, and (3) in all formations below the base of the Utica Shale.

(*Id.* at 23).

One can hardly forget, but this dispute is about the Point Pleasant, which this Court understands neither party disagrees is stratigraphically below the Utica. Based on the above reservation clause subsets, then, this Court must decide whether the third subset reserved Plaintiffs' rights to the Point Pleasant. Importantly, not only does the "commonly known as" language not arise in the grant of rights, it also does not modify "Utica Shale" in the relevant reservation bucket.

At oral argument, Defendants argued to the contrary, attempting to import the "commonly known as" modifier from the second subset of reserved rights into the third. But that is not what the plain text provides. The parties are not arguing about a formation at the top of the Utica Shale, so what lies at the top of what is "commonly known as the Utica Shale"—the second subset—is not relevant to this dispute. Instead, the parties are arguing about a formation at the bottom of the Utica Shale. This brings us to a different question than the one in *TERA II*, in which this Court evaluated whether the Point Pleasant is part of what is "commonly known as the Utica Shale," given that those rights were specifically granted to those defendants. But here, the question is whether the Point Pleasant is part of "the Utica Shale," as Plaintiffs reserved their rights in the Smith-Goshen leases to anything below the base of *the Utica Shale*—not what was *commonly*

*known as* the Utica Shale. The Point Pleasant is below the Utica, so if the Point Pleasant is not part of the Utica Shale, then the Point Pleasant is below it.

This train of thought does not, however, apply to the Schusters' November 10, 2012 lease, which controls four properties and was amended in a way relevant to this dispute. (ECF No. 444 at 18–20). Previously, the reservation clause in this lease mirrored the other Smith-Goshen leases, reserving the Schusters' rights "in all formations below the base of the Utica Shale"—as discussed *supra*. But this Schuster lease as amended instead reserves the Schusters' rights "in all formations 200' below the base of the formation commonly known as the Utica, defined herein as the stratigraphic equivalent of 200' below the top of the Curdsville member of the Lexington formation[.]" (ECF No. 444-28 at 2). Defendants rely on Mr. Schuster's testimony to assert that, as a result, "this amendment permits the Defendants to act within the Point Pleasant[.]" (ECF No. 444 at 19 (citing Schuster Dep., ECF No. 444-9, at 95:21–25)).

While Defendants do not appear to provide a visual that would enable this Court to make an independent judgment about the impact of the amended lease language, Plaintiffs submitted an ODNR Type Log that includes the aforementioned layers. (*See* ECF No. 447 at 27). And even applying the above definition to the Type Log in a light most favorable to Plaintiffs, this Court agrees that, in accordance with the specifically amended language present only in the Schusters' November 10, 2012 lease, the Schusters did not reserve their rights to the Point Pleasant as to these four properties. Understanding this may be a snippet of a longer Type Log, based on the scale, the top of the chart to the line above the Curdsville is no more than approximately four hundred feet. So, two hundred feet *below* the top of the Curdsville cannot be said to incorporate the Point Pleasant, which sits approximately fifty feet above the Curdsville. As to these four of the Schusters' properties, then, Plaintiffs' reservation clause interpretation falls apart. This Court

21

therefore finds that there is no genuine dispute of material fact as to whether the Schusters' November 12, 2012 lease reserved their rights to the Point Pleasant, so summary judgment in favor of the Defendants as to the four properties controlled by that lease—14-00372.000; 14-00075.000; 26-03329.000; and 26-03298.000—is appropriate. Defendants motion is therefore **GRANTED** on in this limited way.

Having aligned on what language this Court is to analyze as to the Smith-Goshen leases, this Court turns to the parties' arguments. Plaintiffs' unambiguity argument primarily turns on two related points: that (1) the Point Pleasant is a separate geological formation from the Utica Shale; and (2) the lease's granting clause must be read in context of the reservation clause, under which the Plaintiffs served the rights to "all formations below the base of the Utica Shale." In Plaintiffs' view, combining these two points leads to the only reasonable conclusion in light of the grant clause's deference to the reservation clause here as opposed to that in *TERA II*: that Plaintiffs reserved all of the oil and gas in the Point Pleasant because the Point Pleasant is a distinct formation that sits below the base of the Utica Shale. In support of this, Plaintiffs walk through (1) the stratigraphic definition of "formation" via their expert; (2) the Ohio Department of Natural Resources' (ODNR) analysis of wells in Eastern Ohio depicting the Point Pleasant as separate from and below the Utica Shale; (3) the Ohio Legislature's delineation of Point Pleasant and Utica in its definition of "horizontal well"; and (4) the Well Completion Reports required by ODNR upon the drilling and fracking of a well, which also lists the Point Pleasant as distinct from and below the Utica. (ECF No. 447 at 24–28).

Defendants find the lease to be unambiguous in its conclusion to the contrary. Defendants emphasize the requirement of using the ordinary, not stratigraphic, understanding of the word "formation"; the role of the phrase "commonly known as" in the reservation clause; and the impact

of these two things on the term "Utica Shale"—which, together, Defendants say, confirm that Plaintiffs did not reserve their rights to the Point Pleasant. (ECF No. 444 at 23–25). To elucidate the plain meaning of the contract, Defendants point to lay witness testimony, online oil and gas forums, and contemporaneous media information. (*Id.* at 26–28). Defendants also provide industry and expert views from Ohio's former State Geologist and ODNR employee and the Energy Information Administration that align with their argument of the plain meaning. (*Id.* 28–30).

In surveying relevant or helpful precedent, this Court has even less to rely on here than in *TERA II* given the related underlying state court proceedings in that case. Yet even there, this Court found that "the Ohio Court of Appeals' decision provides little substantive guidance in this matter as the circumstances of the cases are different." *TERA II*, 2023 WL 4236670, at \*16.

This dearth of case law combined with the different grant and reservation clauses here results in a closer call on the ambiguity question than this Court faced in *TERA II*. Here, Defendants' request for summary judgment is rife with references to the "commonly known as" language, as it understandably was in *TERA II*.[3] Indeed, Defendants characterize Plaintiffs' claims as "depend[ing] on the assertion that the Point Pleasant is not part of the formation commonly known as the Utica Shale," and analyze the plain meaning of "formation commonly known as the Utica Shale." (*Id.* at 10, 22). But as a result of the structure of the Smith-Goshen lease's grant and reservation clauses discussed *supra*, this Court is not interpreting what is "commonly known as the Utica Shale." To be sure, even when this Court was interpreting the "commonly known as" language, this same argument was not persuasive enough to overcome summary judgment. *TERA*

---

[3] (E.g., ECF No. 444 at 2 (discussing the history of "[t]he formation commonly known as the Utica Shale"), 3 (discussing "the public's perception" of formations), 3–4 (discussing the components of what was "commonly known as the Utica Shale"), 5 (discussing the "common understanding of the Utica Shale"), 8 (quoting Wickstrom discussing what was "widely and commonly applied" as part of the Utica Shale)).

*II*, 2023 WL 4236670, at *16. So it certainly is not persuasive enough here in light of the Plaintiffs' stronger arguments to the contrary based on the Smith-Goshen lease language. That said, a jury is free to consider Defendants' arguments regarding what was "commonly known as the Utica Shale" in its interpretation of what is "below the Utica Shale," as the former may be helpful in defining the latter.

Regardless, the parties' arguments again reveal ambiguity in the proper interpretation of the relevant lease provision, albeit in a different way than in *TERA II*. Here, both parties support their arguments as to whether "the Utica Shale" includes the Point Pleasant with definitions and explanations from qualified individuals ranging "across the scientists, landowners, and drilling companies that make up the oil and gas industry." *Id.* But here, Plaintiffs' interpretation is compelling based on the specific lease provisions at issue. In a light most favorable to the nonmovant, however, this Court cannot conclusively determine whether the phrase "below the Utica Shale" includes the Point Pleasant. Therefore, both requests for summary judgment are **DENIED** as to a declaratory judgment based on the unamended Smith-Goshen lease containing the aforementioned reservation clause language.

Because this Court's conclusion as to authority and contractual ambiguity as to all of the other leases applies with equal force to all of Plaintiffs' substantive claims, this Court need not rehash those arguments below, and instead rests on this analysis. But any reference to authorization under the lease does not apply to the four properties controlled by the November 12, 2012 Schuster lease.

### C.    Count II: Trespass

Trespass requires (1) an unauthorized intentional act, and (2) entry upon land in the possession of another. *Georgetown of the Highlands Condo. Owners' Ass'n v. Nsong*, 2018-Ohio-

24

1966, ¶ 36, 113 N.E.3d 192, 199–200 (Ohio Ct. App. 2018). As explained *supra* Section III.B, there exists a genuine dispute of material fact as to whether the leases grant Defendants the authority to drill and extract minerals from the Point Pleasant—that is, whether Defendants' drilling was authorized or unauthorized. Because of this, there logically exists a genuine dispute of fact as to whether Defendants *trespassed* on Plaintiffs' property by drilling into the Point Pleasant below those properties, and this dispute is material: If the Defendants have the authority to drill, Plaintiffs' claim for trespass would fail, but if Defendants do not have authority to drill, Plaintiffs' trespass claim could—but would not necessarily—succeed.

What is more, Plaintiffs seek to satisfy an even higher burden, as they assert that Defendants not only trespassed, but did so in bad faith—that is, "with the knowledge that [they] were] invading the rights of another, or under such circumstances as to charge [them] with knowledge of the character of [their] act[.]" (ECF No. 447 at 35–38). As this Court finds that a reasonable jury could find in favor of either party as to the authority question, this Court is not in a position to determine a subsequent and potentially unnecessary question of whether, should the act be found to be unauthorized, it was also done *knowingly* unauthorized. For this reason alone, this Court cannot conclusively determine that Defendants, in fact, trespassed, let alone did so in bad faith, so Plaintiffs' motion for summary judgment as to trespass—including as to bad faith trespass—is **DENIED** regarding all Defendants.

But deciding if this Court can determine whether Defendants conclusively did *not* trespass requires more analysis. This Court starts with what it finds to be factually clear and established. Based on the evidence submitted by the parties, there is no question that Plaintiffs have established their ownership rights to the minerals underlaying the properties they allege have been impacted by Defendants' actions. And there is no question that Defendants entered the properties crossed

by a well or wellbore intentionally, as Defendants appear to admit that they drilled into and produced gas from the Point Pleasant. (ECF No. 447-18–21).

Even as to subsurface trespass, a plaintiff must still demonstrate "some type of physical damages or interference" such that they were deprived of "reasonable and foreseeable use of the subsurface." *Baker v. Chevron U.S.A. Inc.*, 533 Fed. App'x 509, 521–22 (6th Cir. 2013) (quoting *Chance v. B.P. Chemicals, Inc.*, 77 Ohio St.3d 17, 670 N.E.2d 985, 992–93 (1996)). In Ohio, invasion by wellbore satisfies this physical-invasion requirement, *Chance*, 670 N.E.2d at 993, as the requirement applies even as to pooled units where a landowner receives royalties for all the oil and gas from a well within that unit, regardless of if the oil and gas is drained from that landowner's well, *see TERA II*, 2023 WL 4236670, at *19–20 (citing *Golden Eagle Resources II, LLC v. Rice Drilling D, LLC*, Case No. 2:22-cv-2374, ECF No. 22 at 13 (S.D. Ohio Feb. 10, 2023)).

Here, Plaintiffs have easily satisfied this requirement as to some of Plaintiffs' plots of land the via plat maps, declarations of pooling, geosteering reports, and well completion reports that, combined, reveal where wellbores cross Plaintiffs' properties and where Defendants drilled. (*See* ECF No. 447 at 4–12 (evaluating these documents as to each unit)). But physical invasion by fracking poses a slightly different question: whether the wellbore fractures actually physically intersect those properties not crossed by a wellbore. Plaintiffs attempt to answer this question through geosteering reports, microseismic data, and well completion reports, which provide, among other things, that "the fractures extend 500 feet from both sides of the wellbore" and that "the vast majority of the wells at issue are drilled at 1000 foot spacing consistent with the microseismic data." (ECF No. 451 at 42–43). Plaintiffs conclude that application of these two statements to the specifics of Plaintiffs' property records confirm that "Plaintiffs' [p]roperty is within 500 feet of a wellbore in each unit, except as [sic] the Bennington Units (Tracts 2, 7, 13,

26

44), Marcum East Unit (Tract 22), Heller B (Tract 14), Heller [sic] [A] (Tracts 5, 21)." (*Id.* at 43 (citing ECF No. 447-6)). Under their view, all other tracts were therefore either physically invaded by wellbore or by fracking.

Based on a review of the non-wellbore parcels, this Court finds that Plaintiff has presented sufficient evidence for a reasonable juror to find that at least some of the non-wellbore parcels were physically invaded by the fractures. But, as Plaintiffs admit, this is not the case for all tracts. Accordingly, Defendants' request for summary judgment on Plaintiffs' trespass claim is **GRANTED** only as to the following properties[4] and **DENIED** as to the rest.

- Tracts 2, 7, 13, and 44 of the Bennington Units;

- Tract 22 of the Marcum East Unit;

- Tract 14 of the Heller B Unit; and

- Tracts 5 and 21 of the Heller A Unit.

### D.    Count III & IV: Conversion & Unjust Enrichment

Plaintiffs claim that, because of their possessory interest in the Point Pleasant and the revenues generated therefrom, Defendants have unlawfully converted their property and have been unjustly enriched as a result.

To establish conversion, a plaintiff must prove: "(1) plaintiff's ownership or right to possession of the property at the time of conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages." *6750 BMS, L.L.C. v. Drentlau*, 2016-Ohio-1385, ¶ 28, 62 N.E.3d 928, 934 (Ohio Ct. App. 2016). And for a resulting unjust enrichment, a plaintiff must show: "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by

---

[4] This Court understands all tracts as to which summary judgment is granted to be XTO-drilled wells. (See ECF No. 454 at 1).

the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment." *Padula v. Wagner*, 2015-Ohio-2374, ¶ 47, 37 N.E.3d 799, 813 (Ohio Ct. App. 2015) (quoting *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183, 465 N.E.2d 1298 (Ohio 1984)). As previously established, although one can only assert a claim of conversion for personal property, "subsurface minerals … become personal property immediately upon severance." *TERA II*, 2023 WL 4236670, at \*20–21 (quoting *Schlabach v. Kondik*, 2017-Ohio-8016, ¶ 23, 98 N.E.3d 1048, 1055 (Ohio Ct. App. 2017)). So, conversion, and therefore unjust enrichment, is appropriate in the oil and gas context. *See First Fed. Bank v. Angelini*, 2007-Ohio-6153, ¶ 8, 2007 WL 4090767 (Ohio Ct. App. 2007).

In their opposition to Plaintiffs' conversion and unjust enrichment claims, Defendants rightfully do not take issue with Plaintiffs' lodging of these claims for subsurface minerals generally. Instead, Defendants import their challenges to Plaintiffs' trespass claim in full, and only add that they never admitted to having extracted gas from Plaintiffs' Point Pleasant and that there is no evidence of such. Ascent and XTO additionally argue that the rule of capture bars Plaintiffs' claims for conversion and unjust enrichment because they "were authorized to drill into and produce from the Point Pleasant beneath all wellbore tracts in the Bennington B, Heller A, Heller B, and Kemper A Units, meaning the rule of capture permits any drainage that may have occurred from Plaintiffs' properties." (ECF No. 443 at 12).

As an initial matter, Ascent and XTO's "rule of capture" argument has been implicated by a few aspects of the above analysis. Based on this Court's analysis thus far, this Court rejects any rule of capture argument premised on a grant of rights to the Point Pleasant via either (1) the JOAs and the accompanying JOA leases, *supra* Section III.A(3); or (2) the text of the unamended Smith-Goshen leases at issue, *supra* Section III.B. As was the case in *TERA II*, application of the rule of

capture "in the manner put forth by the Defendants requires this Court to assume that Defendants had the authority to drill into the Point Pleasant adjacent to Plaintiffs property." *TERA II*, 2023 WL 4236670, at *22. But "because there exists a genuine issue of material fact as to whether Defendants acted wrongfully in the first place," summary judgment in favor of either party is inappropriate. *Id.* Having concluded as much, it bears mentioning that finding the rule of capture may apply in some way, shape, or form is distinct from the rule of capture applying in the precise way put forth by a party. This Court, therefore, takes issue with the Defendants' reference to the *TERA II* grant of summary judgment in their favor regarding the former concept as support for the idea that the rule of capture therefore bars Plaintiffs' conversion and unjust enrichment claims here, despite it not barring the plaintiffs' claims there. (*See* ECF No. 443 at 13).

Moving on to more general issues, Defendants are correct that many of the issues lurking under the trespass claim also arise as to the conversion claim. Indeed, this Court has already found that prong one—plaintiff's ownership or right to possession of the property—is established. And two aspects of this Court's analysis above apply to prong two, which requires defendant's *conversion* by a *wrongful* act or disposition of plaintiff's property rights. First, the literal conversion of Plaintiffs' property occurred when the subsurface minerals were severed from the land. Any arguments that Defendants did not actually drain or produce from Plaintiffs' Point Pleasant (other than those ruled out for defendant- or property-specific issues) are not persuasive. (*See, e.g.*, ECF No. 443 at 14 (arguing no proof of drainage)). Second, as to any "wrongfulness," there exists a genuine issue of material fact as to whether Defendants acted without authorization in the first place, and this authorization question is a prerequisite to a finding of wrongful conduct. As such, this Court's analysis of the authority question, *supra*, forecloses summary judgment on conversion in favor of either party. Summary judgment is therefore **DENIED**.

29

### E.     Affirmative Defenses

Defendants advance many affirmative defenses, and Plaintiffs seek summary judgment in their favor for the following: (1) laches; (2) estoppel and quasi-estoppel; (3) consent; (4) ratification; (5) accord and satisfaction; (6) unclean hands; and (7) waiver. (ECF No. 447 at 45–51). As a threshold matter, Plaintiffs apply the correct standard to this issue in their motion, concluding that "the material facts are not in dispute and Plaintiffs are entitled to judgment as a matter of law as to these affirmative defenses." (*Id.* at 45; *contra* ECF No. 450 at 21).

Unsurprisingly, and understandably given that *Passmore* and *TERA II* are effectively on all fours as it pertains to this issue, Plaintiffs assert virtually identical arguments against Defendants' affirmative defenses here as were presented in *TERA II*. The only differences here are that the unclean hands defense is separated from laches and waiver is broken out on its own. For the sake of efficiency, this Court repeats only its bottom-line conclusions as to why summary judgment on any of the aforementioned defenses is inappropriate.

As to laches, there remains a question of fact about whether Defendants were prejudiced by Plaintiffs' delay in bringing suit considering that Defendants continued to profit from their activity on Plaintiffs' property. *TERA II*, 2023 WL 4236670, at *28. But as the nonmovant, interpreting the facts through the summary judgment lens, there is a world in which Defendants can "prove that the amount of money spent to continue extraction and drill new holes would not have been spent had the lawsuit been initiated earlier by Plaintiffs" such that "the money spent may amount to loss of funds and material prejudice against Defendants sufficient to require dismissal under the defense of laches." *Id.* And the unclean hands defense depends on a finding that Defendants acted wrongfully which, as discussed *supra*, this Court cannot determine at this point.

30

Estoppel and quasi-estoppel require too fact-intensive of an inquiry to conclude at this stage that *no* reasonable juror could find that Plaintiffs are not estopped from bringing their claims. It is worth noting that regardless of the outcome on the authorization question, Plaintiffs' acceptance of royalties is not inconsistent with a legal position challenging the conduct that resulted in the royalties. *See Sims v. Anderson*, 2015-Ohio-2727, 38 N.E.3d 1123, 1132 (Ohio Ct. App. 2015); *Bonner Farms, Ltd. v. Fritz*, 355 Fed. App'x 10, 16 (6th Cir. 2009). This sentiment also applies to Plaintiffs' waiver argument, as whether acceptance of royalties functions as a waiver depends on whether Plaintiffs' acceptance was in line with their arguments about the issues with Defendants' underlying conduct. *TERA II*, 2023 WL 4236670, at *29.

Due to the identical nature of the arguments made here to those made in *TERA II*, Plaintiffs fail to address the consent defense, so Plaintiffs' request for summary judgment on that defense is denied on that ground alone. Similarly, as was the case in *TERA II*, this Court does not have the information necessary to resolve the factual questions underlying Defendants' ratification and accord and satisfaction defenses, including whether these defenses apply in the first place.

In summary, there are material questions of genuine fact as to each affirmative defense challenged by Plaintiffs, so summary judgment in their favor is **DENIED**.

### F. Plaintiffs' Motion to Stay (ECF No. 477)

As the motivating factor behind their motion to stay, Plaintiffs express concern over the risk of an adverse judgment and sanctions resulting from Gulfport's motion for contempt. (ECF No. 477 at 2). In its motion, Gulfport asked the Bankruptcy Court to hold the Passmore Plaintiffs in contempt of the parties' settlement agreement, arguing that Plaintiffs are violating the parties' agreement by litigating their claims in this Court. *See supra* Section III.A(2) (discussing the settlement agreement). Gulfport sought similar redress in *TERA II*, and both motions for contempt

31

remain pending in the Bankruptcy Court as of the parties' briefing on Plaintiffs' motion to stay. (ECF No. 477 at 7).

Substantively, as noted *supra*, this Court agrees with Plaintiffs that some of their claims against Gulfport are live here: those for damages that accrued after May 17, 2021. And in absence of a conclusion that none of the claims could possibly have accrued after this date, this Court will not find good faith litigation of these claims to be improper. That being said, this Court appreciates the procedural complexities involved in parallel litigation of the same issues, and therefore considers the five stay factors: "(1) the need for a stay; (2) the stage of litigation; (3) whether the non-moving party will be unduly prejudiced or tactically disadvantaged; (4) whether a stay will simplify the issues; and (5) whether burden of litigation will be reduced for both the parties and the court." *Zimmers v. Eaton Corp.*, No. 15-CV-2398, 2016 WL 1322343, at *2 (S.D. Ohio Apr. 5, 2016).

That the Plaintiffs—the party bringing this case—seek the stay and that Gulfport agrees weigh in favor of granting a stay, particularly in light of the dollar figure penalty Plaintiffs may face should the Bankruptcy Court disagree with this Court's assessment of the scope of the settlement agreement. (*See* ECF No. 477 at 8–9). The same goes for the stage of litigation, as Plaintiffs are correct that this case would likely be heading toward a jury trial, during which that penalty would increase substantially by nature of trial preparation expenses. (*Id.* at 9). Considering Gulfport consents to a stay, this Court finds no potential prejudice in so granting. And as to factors four and five, a stay both simplifies the issues and reduces the burden of litigation by militating the risk of dual-track litigation on the same issues. Therefore, following the entry and effect of the above conclusions, this litigation is **STAYED** pending resolution of Gulfport's motion for contempt in the Bankruptcy Court.

## IV.    CONCLUSION

For the reasons stated above, this Court rules as follows:

- Ascent and XTO's Motion for Summary Judgment (ECF No. 443) is **GRANTED IN PART AND DENIED IN PART** as to potential joint venture liability consistent with the above opinion, and **DENIED** on all other grounds, including as to the effect of the joint operating agreements and the rule of capture in this case.

- Defendants' Motion for Summary Judgment (ECF No. 444) is **GRANTED IN PART AND DENIED IN PART**. This Motion is **GRANTED** only as to the following:

  - On Count I as to the four parcels subject to the Schusters' November 12, 2012 amended lease—14-00372.000; 14-00075.000; 26-03329.000; and 26-03298.000; and

  - On Counts II, III, and IV as to the following properties:

    - Tracts 2, 7, 13, and 44 of the Bennington Units;
    - Tract 22 of the Marcum East Unit;
    - Tract 14 of the Heller B Unit; and
    - Tracts 5 and 21 of the Heller A Unit.

- Gulfport's Motion for Partial Summary Judgment (ECF No. 445) is **GRANTED** consistent with the above opinion.

- Plaintiffs' Motion for Summary Judgment (ECF No. 447) is **DENIED** as to all issues, including affirmative defenses.

- Plaintiffs' Motion to Stay (ECF No. 477) is **GRANTED**.

Therefore, following the entry and effect of the above conclusions, this litigation is **STAYED** pending resolution of Gulfport's motion for contempt in the Bankruptcy Court. The parties are

**ORDERED** to alert this Court of such a resolution or any other related actions that could disrupt or delay the lifting of the stay on the litigation in this Court.

      **IT IS SO ORDERED**.

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATE: March 29, 2024**